520 F.2d 411
 89 L.R.R.M. (BNA) 3028, 77 Lab.Cas. P 11,023
 LOCAL 1104, COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO, and
Local 1101, Communications Workers of America,
AFL-CIO, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
New York Telephone Company and Wellington G. Rigby, Intervenors.
 Nos. 446, 1034, Dockets 74-2044, 74-2230.
 United States Court of Appeals,
Second Circuit.
 Argued June 5, 1975.
Decided July 21, 1975.
 
 H. Howard Ostrin, New York City (Cohn, Glickstein, Lurie, Ostrin & Lubell, New York City), and Kane & Koons, Washington, D. C., of counsel, for petitioners.
 Frederick D. Braid, Mineola, N. Y. (Rains, Pogrebin & Scher, Bertrand B. Pogrebin, Mineola, N. Y., of counsel), for intervenor Rigby.
 Bernard Yaker, New York City, George E. Ashley and William P. Witman, New York City, of counsel, for intervenor New York Telephone Co.
 Robert A. Giannasi, Asst. Gen. Counsel, N. L. R. B., Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Frank C. Morris, Jr., Atty., N. L. R. B., of counsel), for respondent.
 Before SMITH, ANDERSON and OAKES, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 This case presents a novel problem of accommodating a union's legitimate interests of self-preservation with employees' valid but conflicting claims to freedom from compulsory unionism. While our attempt to strike the proper balance must be guided by the National Labor Relations Act, 29 U.S.C. § 151 et seq., the case does not fall neatly under any of its specific provisions. The ensuing necessity to extrapolate from the statutory language, which itself frequently borders on the impenetrable, imparts considerable difficulty to the task of deciding the questions here presented. We are convinced, however as convinced as a court can be when asked to decide what the Congress would have done had it confronted a problem that did not occur to it that the National Labor Relations Board (hereafter the NLRB or the Board) was correct in its determination that the petitioning union locals committed unfair labor practices when they attempted to enforce an agency shop clause against employees who had been denied full union membership for reasons other than their failure to tender union dues. Accordingly, we deny the locals' petition for review and grant the Board's cross-application for enforcement.
 
 I. THE FACTS
 
 2
 Although this case is here on a single petition for review of a single order of the Board, it in fact involves two separate cases, both concerning local unions of the Communications Workers of America, AFL-CIO (CWA), and employees of the New York Telephone Company (Telco).
 
 
 3
 A. The Local 1101 (Telco) Case.
 
 
 4
 Local 1101 of the CWA represents Telco employees in Manhattan and the Bronx.[1] It participated in the CWA's nation-wide telephone strike in July, 1971. Although an agreement between the CWA and the Bell System was reached to end the strike nationally on July 21, the New York locals rejected the proposed settlement and stayed out until approximately February 18, 1972.[2] The new contract with Telco which was ratified at that time contained the following "agency shop" provision:
 
 ARTICLE 33
 Agency Shop
 
 5
 33.01. Each regular employee shall, as a condition of employment, pay or tender to the Union amounts equal to the periodic dues applicable to members for the period beginning 30 days after hire or 30 days after February 17, 1972, whichever occurs later, until the termination of this collective bargaining agreement, except that an employee may terminate this condition of employment by giving a written individual notice to the Company and the Union of such termination by certified or registered mail, return receipt requested, and postmarked between July 8, 1974 and July 17, 1974 both dates inclusive.
 
 
 6
 During the strike, numerous employees who either resigned their union membership or never were union members crossed the picket lines and went to work. In July, 1972 four months after the strike's end at least twenty-nine of these employees ("the strikebreakers") applied for union membership and signed check-off cards authorizing the deduction of union dues from their pay. On or about August 18, 1972, Local 1101 denied their applications, solely because they had not participated in the strike. The employees then refused to tender amounts equivalent to union dues, whereupon the local, on or about December 4, 1972, demanded their discharge by Telco under the agency shop clause. Telco refused, and on February 2, 1973, it filed a charge of unfair labor practices against the union with the NLRB. The Regional Director issued a complaint, alleging that the local had violated § 8(b)(1)(A) and § 8(b)(2)[3] by denying union membership to the strikebreakers and again by attempting to invoke the agency shop clause against them. The Administrative Law Judge held that the unfair labor practices were committed as charged, and his decision was adopted by the Board. 211 NLRB No. 18 (1974).
 
 
 7
 B. The Local 1104 (Rigby) Case.
 
 
 8
 Wellington Rigby has been employed by Telco since 1948. He was a member of Local 1104 which has jurisdiction over Nassau County but resigned just prior to the 1971 strike. Although he honored the CWA's picket lines, he engaged in organizational activities on behalf of the Teamsters, a rival union, soon after the strike's end. His efforts proved unsuccessful and in July, 1972, he applied for membership in Local 1104 and executed a dues check-off card. On September 5, 1972, the local denied his application because of his activities on behalf of the Teamsters. Rigby then refused to tender any more dues, and the local attempted to invoke the agency shop clause to obtain his discharge. Rigby filed a charge with the Board; the Regional Director refused to issue a complaint, but was reversed by the Board's General Counsel. The complaint that ultimately issued unlike that in the Telco case did not claim that the refusal to admit Rigby to membership in the local was an unfair labor practice, but rather was limited to the invocation of the agency shop clause in an attempt to cause his discharge. The Administrative Law Judge held that this was indeed an unfair labor practice, and his conclusion was adopted by the Board.
 
 
 9
 II. DENIAL OF STRIKEBREAKERS' MEMBERSHIP APPLICATIONS.
 
 
 10
 Under § 8(b)(1)(A), a union may not restrain or coerce employees in the exercise of rights protected by § 7, 29 U.S.C. § 157. Clearly the strikebreakers were engaged in protected activity when they declined to participate in the strike. Local 1101 maintains that it was justified in denying them membership by the proviso to § 8(b)(1)(A), permitting unions to establish rules regarding the acquisition or retention of membership. But the strike itself was unlawful under § 8(d), see note 2, supra, and it is by now well established that the proviso to § 8(b)(1)(A) will not benefit a union in a case where its rules frustrate national labor policy.[4] Scofield v. NLRB, 394 U.S. 423, 429, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969); NLRB v. Communications Workers of America, AFL-CIO, Local 1170 (Rochester Telephone), 474 F.2d 778, 782 (2d Cir. 1972). The local argues that this doctrine is inapplicable here because there is no evidence that the strike's illegality motivated the strikebreakers to cross the picket lines. Subjective intent, however, is irrelevant. The strike's illegality is lessened not one whit by the personal motives of the strikebreakers, and the union, having violated the Act, must live with the consequences. It may not invoke the need to maintain loyalty in its ranks to exclude those who could have demonstrated their allegiance only by participating in unlawful activity.[5]
 
 
 11
 The local seeks to shore up its argument on the merits with a procedural claim: It contends that the charge, insofar as it relates to the denial of membership, is time-barred under § 10(b) of the Act, 29 U.S.C. § 160(b) (". . . (N)o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge . . .."). The strike ended on or about February 18, 1972, the applications for membership were denied on or about August 18 of that year, and the charge was filed on February 2, 1973. If the six-month period began to run with the denials of membership on August 18, then clearly the charge was timely. But the local contends that the time must be computed from the last day of the strike, relying on Local Lodge No. 1424, International Association of Machinists v. NLRB, 362 U.S. 411, 416-17, 80 S.Ct. 822, 826, 827, 4 L.Ed.2d 832 (1960):
 
 
 12
 It is doubtless true that § 10(b) does not prevent all use of evidence relating to events transpiring more than six months before the filing and service of an unfair labor practice charge. However, in applying rules of evidence as to the admissibility of past events, due regard for the purposes of § 10(b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely "evidentiary," since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice.
 
 
 13
 (Footnote omitted.) The local claims that, since it would not have been unlawful to exclude the strikebreakers from union membership had the strike not been an unfair labor practice, this case falls into the second category described in Local Lodge No. 1424, and therefore the six-month period of § 10(b) must start to run from the end of the strike.
 
 
 14
 This claim is ingenious, and indeed its logic is compelling if the language of Local Lodge No. 1424 is applied literally. Therein, however, lies the argument's undoing. We have recently warned against the literal application of language in Supreme Court opinions to different factual situations, Wallace v. Kern, 520 F.2d 400, 406, 407 (2d Cir. 1975); Communications Workers of America, AFL-CIO v. American Telephone & Telegraph Co., 513 F.2d 1024, 1028 (2d Cir.), petition for cert. filed, 43 U.S.L.W. 3684 (U.S. June 19, 1975) (No. 74-1601), and in light of those warnings a review of the facts in Local Lodge No. 1424 is appropriate. The union there had entered into a collective bargaining agreement containing a union security clause even though it did not represent a majority of employees an unfair labor practice, according to prior decisions of the Board. The clause was enforced by taking dues out of employees' pay. More than six months after the negotiation of the contract an employee filed an unfair labor practice charge based on the continued enforcement of the union security clause. That charge was held time-barred. The significant factor differentiating that case from this is that there the employee could have filed her charge at any time after the agreement went into effect. Here, however, it was only after the strikebreakers had been refused membership that they could even have considered filing a charge. The strike ended on February 18, and the denials of membership were announced on August 18, six months to the day after the strike ended six months and one day if one starts to count from February 17, the last day of the strike, rather than February 18, the day work resumed. Thus, to sustain the local's position here would be to hold that, although an unfair labor practice occurred, there was never a time or at most only a few hours when a timely charge could have been filed. Surely the Court in Local Lodge No. 1424 did not intend such a result. "It does not seem reasonable to argue that the statutory limitations period begins to run" or may even run out "before the violation occurs." NLRB v. Plumbers & Pipe Fitters Local Union 214, 298 F.2d 427, 428 (7th Cir. 1962). We therefore hold that the six-month time period of § 10(b) began to run on August 18, 1972, the date on which the strikebreakers were denied union membership, and we sustain the Board's conclusion that this denial constituted an unfair labor practice under § 8(b) (1)(A).
 
 
 15
 III. INVOCATION OF THE AGENCY SHOP CLAUSE.
 
 
 16
 The more difficult and troubling question presented here is whether the petitioning locals committed unfair labor practices when they sought to invoke the agency shop clause against Rigby and the strikebreakers. In finding that they did, the Administrative Law Judge relied on two earlier Board decisions, Local 4186, United Steelworkers of America, AFL-CIO (McGraw Edison Co.), 181 NLRB 992 (1970), and Communications Workers of America, Local 9509 (Pacific Telephone and Telegraph Co.), 193 NLRB 83 (1971). In McGraw Edison, an employee who filed a decertification petition with the Board was denied the right to attend union meetings and to hold union office for one year; he thereupon refused to pay his dues, and the union demanded his discharge pursuant to a valid union shop clause.[6] The Board held that the union thereby violated § 8(b)(1)(A), since its insistence on payment of dues during a period when the employee's membership rights were impaired "constituted a continuing form of coercion tending to operate as a serious restraint upon access to Board's processes." 181 NLRB 992. In Pacific Telephone, employees soliciting signatures in support of a decertification petition were expelled from the union; they ceased paying dues, and the union demanded their discharge.[7] Relying on McGraw Edison, the Board held that the union violated § 8(b)(1)(A) and § 8(b)(2).
 
 
 17
 To the extent that McGraw Edison and Pacific Telephone were premised on preserving a right of access to the Board, they are distinguishable; moreover, McGraw Edison involved a union shop rather than an agency shop clause. In any event, those decisions are of course not binding on us, and we prefer to give the issue a fresh look.
 
 
 18
 There can be no doubt about the validity of an agency shop agreement as a permissible variant of the explicitly approved union shop agreement. That was the holding of NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). Noting that under § 8(a)(3) union membership "insofar as it has significance to employment rights . . . is whittled down to its financial core," id. at 742, 83 S.Ct. at 1459, the Court found the agency shop clause to be consistent with the Act's purposes:
 
 
 19
 We are therefore confident that the proposal made by the union here conditioned employment upon the practical equivalent of union "membership," as Congress used that term in the proviso to § 8(a)(3). The proposal for requiring the payment of dues and fees imposes no burdens not imposed by a permissible union shop contract and compels the performance of only those duties of membership which are enforceable by discharge under a union shop arrangement. If an employee in a union shop unit refuses to respect any union-imposed obligations other than the duty to pay dues and fees, and membership in the union is therefore denied or terminated, the condition of "membership" for § 8(a)(3) purposes is nevertheless satisfied and the employee may not be discharged for nonmembership even though he is not a formal member. Of course, if the union chooses to extend membership even though the employee will meet only the minimum financial burden, and refuses to support or "join" the union in any other affirmative way, the employee may have to become a "member" under a union shop contract, in the sense that the union may be able to place him on its rolls. The agency shop arrangement proposed here removes that choice from the union and places the option of membership in the employee while still requiring the same monetary support as does the union shop. Such a difference between the union and agency shop may be of great importance in some contexts, but for present purposes it is more formal than real. To the extent that it has any significance at all it serves, rather than violates, the desire of Congress to reduce the evils of compulsory unionism while allowing financial support for the bargaining agent.
 
 
 20
 Id. at 743-44, 83 S.Ct. at 1459-1460 (footnotes omitted).
 
 
 21
 Seizing on the notion of the payment of dues as the practical equivalent of membership, the locals argue that there are really two kinds of union membership: full membership and "financial core" membership. In the case of an agency shop, it is claimed, financial core membership simply maintaining one's dues is all that the Act means when it refers to membership; and so when it is said that an employee can be discharged if his membership is refused or terminated for failure to pay dues, financial core membership is all that is meant. Thus, when Rigby and the strikebreakers applied for full membership and were turned down, they were not denied financial core membership; that denial occurred only when they subsequently refused to pay dues, and was clearly based on that refusal. Therefore, the argument goes, membership financial core membership was denied for the failure to pay dues, and it was proper under § 8(b)(2) for the locals to seek the employees' discharges.
 
 
 22
 This argument has some appeal, largely because of the manner in which the Court in General Motors justified agency shops. However, we must reject it, for instead of accommodating the agency shop to the Act, it twists the Act to accommodate this version of the version of the agency shop. In General Motors, the Court approved agency shop agreements, but only within the confines of the Act; it did not amend the Act to authorize any possible side effects of agency shop agreements that might run afoul of statutory purposes. As the Court noted, in approving union shops the Congress wanted not only to protect unions from free riders but also to minimize the abuses of compulsory unionism. 373 U.S. 734 at 740-41, 83 S.Ct. 1453. This second goal was effected by circumscribing the grounds on which a union could invoke a union shop clause to seek an employee's discharge: Under § 8(b)(2) if an employee's membership is denied or terminated for reasons other than the failure to pay dues, the union may not cause the employer to discriminate against the employee. The argument urged on us by the locals in this case would in effect read the notion of a reason other than the failure to pay dues out of the Act, and thereby eliminate the Congress' carefully placed wedge against compulsory unionism. For by definition, under the locals' scheme, there can be no reason for the denial of financial core membership except the failure to pay dues, since financial core membership means nothing more nor less than the fact that an employee pays his dues. We hold, therefore, that in order to give meaning to the "other than his failure to tender the periodic dues" clause of § 8(b)(2), we must look to the reason for denial of full membership, not the reason for denial of financial core membership.[8] Where, as here, the denial of full membership was not for the failure to pay dues, but rather for engaging in protected activity, the union's attempt to invoke the agency shop clause violates § 8(b) (1)(A) and § 8(b)(2). NLRB v. Bell Aircraft Corp.,206 F.2d 235 (2d Cir. 1953).
 
 
 23
 We also note that the locals' interpretation of their agency shop clause is contrary to the Supreme Court's understanding, enunciated in General Motors, of what an agency shop entails. Such an agreement, said the Court, "places the option of membership in the employee while still requiring the same monetary support as does the union shop." 373 U.S. 734 at 744, 83 S.Ct. at 1460. If the locals prevail here, they will have arrogated to themselves the employees' choice regarding union membership while nonetheless requiring them to pay dues.[9] A union should not, under the circumstances here presented, be entitled to exact dues from employees after depriving them of their membership options by excluding them from its ranks. This conclusion follows rather easily in the Telco case, where the exclusion itself was unlawful; the Rigby case, where the exclusion was apparently proper, is more difficult, but in light of the considerations set forth in the previous paragraph we see no reason for reaching a different decision.
 
 
 24
 A third factor influencing our rejection of the locals' position is that it would lead to incongruous results. An agency shop is generally viewed as a weaker form of union security agreement than a union shop; it "imposes no burdens not imposed by a permissible union shop contract and compels the performance of only those duties of membership which are enforceable by discharge under a union shop arrangement." NLRB v. General Motors Corp., supra, 373 U.S. 734 at 743, 83 S.Ct. 1453 at 1459, 10 L.Ed.2d 670. Under a union shop clause, it is clear that one would look to the reason for denial of full membership in determining whether there was a violation of § 8(b)(2). See, e. g., Union Starch & Refining Co. v. NLRB, 186 F.2d 1008 (7th Cir.), cert. denied, 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617 (1951). Yet under the union's theory here the reasons for the denial of full membership would become irrelevant, in effect giving the union a greater degree of coercive power over employees than it would have in the case of a union shop.
 
 
 25
 The Union Starch case, supra, is not, as the locals contend, contrary to our decision here. There the union refused membership to employees who tendered dues but would not take an oath of loyalty. At the union's invocation of a union shop clause, the employer discharged the employees. This was held to be an unfair labor practice since the employees were denied membership for their refusal to take the oath, and not for their failure to pay dues. The locals contend that this decision was predicated on the fact that the employees did in fact tender their dues, and that the court would not have found an unfair labor practice had there not been a tender of dues. Speculating on what a court would have decided had a different set of facts been before it is a hazardous business, however, and we find no need to engage in it here. Whether or not the employees continued to pay dues after the rejection of their initial tender was simply not considered by the court in Union Starch. The locals have argued the significance of that fact here because we are dealing with an agency as opposed to a union shop, but our interpretation of the status of the agency shop under the Act renders it largely irrelevant. As did the court in Union Starch, we have looked only to the reasons for the denial of full membership; here, as there, that denial was on grounds other than the failure to pay dues. Our decision that the subsequent invocation of the agency shop clause was an unfair labor practice is thus consistent with what was actually decided in Union Starch, and we decline to consider whether it would be consistent with what the court there might have decided under a different set of facts.
 
 
 26
 One final point deserves brief comment. The locals claim that enforcement of the Board's order would violate fundamental national labor policy in that it would render unions, which as exclusive bargaining agents have a duty of fairly representing all employees, Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), helpless to prevent free riders from enjoying the benefits of union representation while avoiding their fair share of the costs. See Radio Officers' Union v. NLRB, 347 U.S. 17, 41, 74 S.Ct. 323, 98 L.Ed. 455 (1954). This argument has little merit in the Telco case since the strikebreakers wanted to join the union and pay dues and their exclusion was itself unlawful. In Rigby's case, however, a germ of a free rider problem does present itself: The union was within its rights in denying his membership application, and after our decision here it will either have to take him in or forego his financial support. While Rigby will in effect be a free rider, we do not think the problem to be of significant dimension. Our decision does not invite all employees simply to stop paying dues, for if they do that and nothing more they will be subject to discharge. The only free riders will be those who, like Rigby, are lawfully excluded from the union for activity that, though protected by § 7, is disloyal to the union. And if the number of such employees rises to the point where the lack of their dues becomes serious, the union will most likely be suffering from problems greater than free riders. Thus, while our decision necessarily entails some inroads on a union's ability to protect itself from free riders, the invasion is not serious. A contrary decision would create far greater problems of compulsory unionism, the elimination of which is as much a part of national labor policy as is the competing goal of protecting unions from free riders. Absent explicit legislative instruction, we prefer the result that appears to us to entail the lesser sacrifice.
 
 
 27
 The petition for review is denied and the Board's cross-application for enforcement is granted.
 
 
 
 [1]
 The Administrative Law Judge's opinion states that Local 1101 has jurisdiction over Suffolk County, whereas Telco's brief places it in Manhattan and the Bronx. Since the charge filed with the Board by Telco locates the plant in question at 140 West Street, New York City, it would appear that the Administrative Law Judge was mistaken. The error, however, is inconsequential
 
 
 [2]
 This strike has been held illegal for failure to comply with the notice provisions of the Act, § 8(d), 29 U.S.C. § 158(d), Communications Workers of America, AFL-CIO (New York Telephone Co.), 208 NLRB No. 32 (1974), and that determination is not contested in this proceeding
 
 
 [3]
 Section 8(b), 29 U.S.C. § 158(b), provides in pertinent part:
 (b) It shall be an unfair labor practice for a labor organization or its agents
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . .;
 (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.
 The relevant portion of subsection (a)(3) referred to in § 8(b)(2) makes it an unfair labor practice for an employer
 by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later . . . ; Provided further,
 That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;
 
 
 [4]
 Section 8(d) "seeks, during (the) natural renegotiation period (of a collective bargaining agreement), to relieve the parties from the economic pressure of a strike or lockout in relation to the subjects of negotiation," Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 286, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956), and accordingly is a key ingredient in the national policy of promoting industrial peace through collective bargaining
 
 
 [5]
 If any employee's refusal to participate in the strike had been accompanied by anti-union campaigning, attacks on the union leadership, or similar conduct, we might have a different case, for it could be argued that the denial of membership was not on account of nonparticipation in the strike but rather on account of the accompanying activity. Here, however, the sole basis for turning down the strikebreakers' applications was their refusal to honor the strike
 
 
 [6]
 A union shop clause requires union membership as a condition of employment and is specifically authorized by § 8(a)(3); an agency shop is also a union security arrangement, but it requires only that employees pay the equivalent of dues, full membership in the union being optional
 
 
 [7]
 Whether the union security clause involved was a union shop or an agency shop clause is not specified, but the Board's opinion appears to indicate the latter. 193 NLRB 83 at 84
 
 
 [8]
 The locals claim that a recent decision, NLRB v. Hershey Foods Corp., 513 F.2d 1083 (9th Cir. 1975), is contrary to this conclusion. We disagree. There an employee resigned from the union but offered to pay his dues. The union claimed that this was not enough under the controlling union shop clause, and caused the employer to discharge the employee. It was held that under the union shop clause an employee could only be compelled to maintain financial core membership, that the employee had fulfilled this requirement, and that his discharge was therefore an unfair labor practice. That decision can coexist peacefully with ours; the rule resulting from a combination of the two cases would appear to be that, although a union, even under a union shop clause, cannot compel any greater degree of membership than financial core membership, it must nonetheless, even under an agency shop clause, grant full membership to those employees who desire it if it wants to retain its right to receive their dues
 
 
 [9]
 In General Motors, supra, 373 U.S. 734 at 745 n. 12, 83 S.Ct. 1453 at 1460, 10 L.Ed.2d 670, the Court specifically noted that "the significance of desired, but unavailable, union membership, or the benefits of membership, . . . we leave for another case."