.NATIONAL LABOR RELATIONS BOARD *v.*
GENERAL MOTORS CORP.

No. 404. Argued April 18, 1963.—Decided June 3, 1963.

*Solicitor General Cox* argued the cause for petitioner.
With him on the brief were *Stuart Rothman, Dominick L.
Manoli* and *Norton J. Come.*

*Harry S. Benjamin, Jr.* argued the cause for respondent.
With him on the brief was *Aloysius F. Power.*

*J. Albert Woll, Robert C. Mayer, Theodore J. St.
Antoine, Thomas E. Harris, Joseph L. Rauh, Jr., John
Silard* and *Harold A. Cranefield* filed a brief for the Amer-
ican Federation 'of Labor and Congress of Industrial
Organizations et al., as *amici curiae,* urging reversal.

*Owen J. Neighbours* filed a brief for Raymond E. Lewis
et al., as *amici curiae,* urging affirmance.

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue here is whether an employer commits an
unfair labor practice, National Labor Relations Act

§ 8 (a)(5),[1] when it refuses to bargain with a certified union over the union's proposal for the adoption of the "agency shop." More narrowly, since the employer is not obliged to bargain over a proposal that he commit an unfair labor practice, the question is whether the agency shop is an unfair labor practice under § 8 (a)(3) of the Act or else is exempted from the prohibitions of that section by the proviso thereto.[2] We have concluded that this type of arrangement does not constitute an unfair labor practice and that it is not prohibited by § 8.

Respondent's employees are represented by the United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, in a single, multiplant, company-wide unit. The 1958 agreement between union and company provides for maintenance of membership and the union shop.[3] These provisions were not operative,

---

[1] "SEC. 8. (a) It shall be an unfair labor practice for an employer—

.        .    .              .              .              .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a)."

[2] "SEC. 8. (a) It shall be an unfair labor practice for an employer—

.        .    .              .              .              .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later . . . ."

[3] "Union Security and Check-Off of Union Membership Dues

"(4) An employe who is a member of the Union at the time this Agreement becomes effective shall continue membership in the Union for the duration of this Agreement to the extent of paying an initiation fee and the membership dues uniformly required as a condition of acquiring or retaining membership in the Union.

"(4a) An employe who is not a member of the Union at the time this Agreement becomes effective shall become a member of the Union within 60 days after the thirtieth (30th) day following the

however, in such States as Indiana where state law prohibited making union membership a condition of employment.

In June 1959, the Indiana intermediate appellate court held that an agency shop arrangement would not violate the state right-to-work law. *Meade Elec. Co.* v. *Hagberg*, 129 Ind. App. 631, 159 N. E. 2d 408. As defined in that opinion, the term "agency shop" applies to an arrangement under which all employees are required as a condition of employment to pay dues to the union and pay the union's initiation fee, but they need not actually become union members. The union thereafter sent respondent a letter proposing the negotiation of a contractual provision covering Indiana plants "generally similar to that set forth" in the *Meade* case. Continued employment in the Indiana plants would be conditioned upon the payment of sums equal to the initiation fee and regular monthly dues paid by the union members. The intent of the proposal, the National Labor Relations

---

effective date of this Agreement or within 60 days after the thirtieth (30th) day following employment, whichever is later, and shall remain a member of Union, to the extent of paying an initiation fee and the membership dues uniformly required as a condition of acquiring or retaining membership in the Union, whenever employed under, and for the duration of, this Agreement.

"(4b) Anything herein to the contrary notwithstanding, an employe shall not be required to become a member of, or continue membership in, the Union, as a condition of employment, if employed in any state which prohibits, or otherwise makes unlawful, membership in a labor organization as a condition of employment.

"(4c) The Union shall accept into membership each employe covered by this Agreement who tenders to the Union the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership in the Union.

"(4f) 'Member of the Union' as used in paragraphs (4) and (4a) above means any employe who is a member of the Union and is not more than sixty (60) days in arrears in the payment of membership dues."

Board concluded, was not to require membership but to make membership available at the employees' option and on nondiscriminatory terms. Employees choosing not to join would make the required payments and, in accord-ance with union custom, would share in union expenditures for strike benefits, educational and retired member benefits, and union publications and promotional activities, but they would not be entitled to attend union meetings, vote upon ratification of agreements negotiated by the union, or have a voice in the internal affairs of the union.[4] The respondent made no counterproposal, but replied to the union's letter that the proposed agreement would violate the National Labor Relations Act and that respondent must therefore "respectfully decline to comply with your request for a meeting" to bargain over the proposal.

The union thereupon filed a complaint with the National Labor Relations Board against respondent for its alleged refusal to bargain in good faith. In the Board's view of the record, "the Union was not seeking to bargain over a clause requiring nonmember employees to pay sums equal to dues and fees as a condition of employment while at the same time maintaining a closed-union policy with respect to applicants for membership," since the proposal contemplated an arrangement in which "all employees are *given the option* of becoming, or re-fraining from becoming, members of the Union." Pro-ceeding on this basis and putting aside the consequences of a closed-union policy upon the legality of the agency shop, the Board assessed the union's proposal as comporting fully with the congressional declaration of policy in favor of union-security contracts and therefore a mandatory subject as to which the Act obliged respondent to

---

[4] The union's vice-president so explained the union proposal, and the Board seems to have accepted this view. 133 N. L. R. B. 451, at 456, n. 12.

bargain in good faith. At the same time, it stated that it had "no doubt that an agency-shop agreement is a permissible form of union-security within the meaning of Sections 7 and 8 (a)(3) of the Act." Accordingly, the Board ruled that respondent had committed an unfair labor practice by refusing to bargain in good faith with the certified bargaining representative of its employees,[5] and it ordered respondent to bargain with the union over the proposed arrangement; no back-pay award is involved in this case. 133 N. L. R. B. 451, 456, 457.

Respondent petitioned for review in the Court of Appeals, and the Board cross-petitioned for enforcement. The Court of Appeals set the order aside on the grounds that the Act tolerates only "an agreement requiring membership in a labor organization as a condition of employment" when such agreements do not violate state right-to-work laws, and that the Act does not authorize agreements requiring payment of membership dues to a union, in lieu of membership, as a condition of employment. It held that the proposed agency shop agreement would violate §§ 7, 8 (a)(1), and 8 (a)(3) of the Act and that the employer was therefore not obliged to bargain over it. 303 F. 2d 428 (C. A. 6th Cir.). We granted certiorari, 371 U. S. 908, and now reverse the decision of the Court of Appeals.

Section 8 (3) under the Wagner Act was the predecessor to § 8 (a)(3) of the present law. Like § 8 (a)(3), § 8 (3) forbade employers to discriminate against employees to compel them to join a union. Because it was feared that § 8 (3) and § 7, if nothing were added to qualify them, might be held to outlaw union-security arrangements such as the closed shop, see 79 Cong. Rec.

---

[5] The Board also held that respondent's refusal to bargain interfered with, restrained, and coerced its employees in the exercise of their National Labor Relations Act § 7 rights, contrary to National Labor Relations Act § 8 (a)(1).

7570 (statement of Senator Wagner), 7674 (statement of Senator Walsh); H. R. Rep. No. 972, 74th Cong., 1st Sess. 17; H. R. Rep. No. 1147, 74th Cong., 1st Sess. 19, the proviso to § 8 (3) was added expressly declaring:

> "*Provided,* That nothing in this Act . . . or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a) . . . ."

The prevailing administrative and judicial view under the Wagner Act was or came to be that the proviso to § 8 (3) covered both the closed and union shop, as well as less onerous union-security arrangements, if they were otherwise legal. The National Labor Relations Board construed the proviso as shielding from an unfair labor practice charge less severe forms of union-security arrangements than the closed or the union shop,[6] including an arrangement in *Public Service Co. of Colorado,* 89 N. L. R. B. 418,[7] requiring nonunion members to pay to

---

[6] See, *e. g., M. & J. Tracy, Inc.,* 12 N. L. R. B. 916, 931–934; *J. E. Pearce Contracting & Stevedoring Co., Inc.,* 20 N. L. R. B. 1061, 1070–1073. And see the memorandum printed by the Senate committee, commenting upon the final bill, which indicated that the exemption of the proviso was not limited to the closed or union shop:

"Unless this change is made as provided in S, 1958, most strikes for a closed shop or even for a preferential shop would by this act be declared to be for an illegal purpose . . . .

"As the legislative history of [N. I. R. A. §] 7 (a) demonstrates, nothing in that section was intended to deprive labor of its existing rights in many States to contract or strike for a closed or preferential shop . . . . No reason appears for a contrary view here." 1 Leg. Hist. N. L. R. A. 1354–1355.

[7] This case was decided in 1950, but it was governed by the Wagner Act because the agreement was covered by the saving clause in the Labor Management Relations Act, § 102, 89 N. L. R. B., at 419–420.

the union $2 a month "for the support of the bargaining unit." And in *Algoma Plywood Co.* v. *Wisconsin Board,* 336 U. S. 301, 307, which involved a maintenance of membership agreement, the Court, in commenting on petitioner's contention that the proviso of § 8 (3) affirmatively protected arrangements within its scope, cf. *Garner* v. *Teamsters Union,* 346 U. S. 485, said of its purpose: "The short answer is that § 8 (3) merely disclaims a national policy hostile to the closed shop *or other forms of union-security agreement."* (Emphasis added.)

When Congress enacted the Taft-Hartley Act, it added the following to the language of the original proviso to § 8 (3):

"on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later . . . *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." 29 U. S. C. § 158 (a)(3).

These additions were intended to accomplish twin purposes. On the one hand, the most serious abuses of compulsory unionism were eliminated by abolishing the closed shop. On the other hand, Congress recognized that in the absence of a union-security provision "many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share

of the cost." S. Rep. No. 105, 80th Cong., 1st Sess., p. 6, 1 Leg. Hist. L. M. R. A. 412. Consequently, under the new law "employers would still be permitted to enter into agreements requiring all the employees in a given bargaining unit to become members 30 days after being hired," but "expulsion from a union cannot be a ground of compulsory discharge if the worker is not delinquent in paying his initiation fee or dues." S. Rep. No. 105, p. 7, 1 Leg. Hist. L. M. R. A. 413. The amendments were intended only to "remedy the most serious abuses of compulsory union membership and yet give employers and unions who feel that such agreements promoted stability by eliminating 'free riders' the right to continue such arrangements." *Ibid.* As far as the federal law was concerned, all employees could be required to pay their way. The bill "abolishes the closed shop but permits voluntary agreements for requiring such forms of compulsory membership as the union shop or maintenance of membership . . . ." S. Rep. No. 105, p. 3, 1 Leg. Hist. L. M. R. A. 409.

We find nothing in the legislative history of the Act indicating that Congress intended the amended proviso to § 8 (a)(3) to validate only the union shop and simultaneously to abolish, in addition to the closed shop, all other union-security arrangements permissible under state law. There is much to be said for the Board's view that, if Congress desired in the Wagner Act to permit a closed or union shop and in the Taft-Hartley Act the union shop, then it also intended to preserve the status of less vigorous, less compulsory contracts which demanded less adherence to the union.

Respondent, however, relies upon the express words of the proviso which allow employment to be conditioned upon "membership": since the union's proposal here does not require actual membership but demands only initiation fees and monthly dues, it is not saved by the proviso.

This position, of course, would reject administrative decisions concerning the scope of § 8 (3) of the Wagner Act, e. g., *Public Service Co. of Colorado, supra,* reaffirmed by the Board-under the Taft-Hartley amendments, *American Seating Co.,* 98 N. L. R. B. 800.[8]  Moreover, the 1947 amendments not only abolished the closed shop but also made significant alterations in the meaning of "membership" for the purposes of union-security contracts.   Under the second proviso to § 8 (a)(3), the burdens of membership upon which employment may be conditioned are expressly limited to the payment of initiation fees and monthly dues.  It is permissible to condition employment upon membership, but membership, insofar as it has significance to employment rights, may in turn be conditioned only upon payment of fees and dues.   "Membership" as a condition of employment is whittled down to its financial core.   This Court has said as much before in *Radio Officers' Union* v. *Labor Board,* 347 U. S. 17, 41:

> "This legislative history clearly indicates that Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees.  Thus Congress recognized the validity of unions' concern about 'free

---

[8] In that case, the Board stated:

"As to the requirement in paragraph 4 that religious objectors who do not become members pay to the Intervenor sums equivalent to dues, the Board has ruled that closed-shop agreements providing for 'support money' payments did not violate the proviso to Section 8 (3) of the Wagner Act.  As the precise language of the 8 (3) proviso in the Wagner Act was continued in the amended Act with certain added qualifications not pertinent here, and because the legislative history of the amended Act indicates that Congress intended not to illegalize the practice of obtaining support payments from nonunion members who would otherwise be 'free riders,' we find that the provision for support payments in the instant contract does not exceed the union-security agreements authorized by the Act." 98 N. L. R. B., at 802.

riders,' *i. e.*, employees who receive the benefits of union representation but are unwilling to contribute their fair share of financial support to such union, and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason. . . ."

We are therefore confident that the proposal made by the union here conditioned employment upon the practical equivalent of union "membership," as Congress used that term in the proviso to § 8 (a)(3).[9] The proposal for requiring the payment of dues and fees imposes no burdens not imposed by a permissible union shop contract and compels the performance of only those duties of membership which are enforceable by discharge under a union shop arrangement. If an employee in a union shop unit refuses to respect any union-imposed obligations other than the duty to pay dues and fees, and membership in the union is therefore denied or terminated, the condition of "membership" for § 8 (a)(3) purposes is nevertheless satisfied and the employee may not be discharged for nonmembership even though he is not a formal member.[10] Of course, if the union chooses to extend member-

---

[9] Referring to the Canadian practice, Senator Taft stated that the rule adopted by the Conference Committee "is substantially the rule now in effect in Canada" which is that "the employee must, nevertheless, pay dues, even though he does not join the union" and that if he pays the dues without joining he has the right to be employed. 93 Cong. Rec. 4887, 2 Leg. Hist. L. R. M. A. 1422.

[10] *Union Starch & Ref. Co.* v. *Labor Board,* 186 F. 2d 1008 (C. A. 7th Cir.). See also *Labor Board* v. *Food Fair Stores,* 307 F. 2d 3 (C. A. 3d Cir.); *Labor Board* v. *Local 815, International Brotherhood of Teamsters,* 290 F. 2d 99 (C. A. 2d Cir.); *Labor Board* v. *Local 450, International Union of Operating Engineers,* 281 F. 2d 313, 316–317 (C. A. 5th Cir.); *Labor Board* v. *National Automotive Fibres, Inc.,* 277 F. 2d 779 (C. A. 9th Cir.); *Labor Board* v. *Die &*

ship even though the employee will meet only the minimum financial burden, and refuses to support or "join" the union in any other affirmative way, the employee may have to become a "member" under a union shop contract, in the sense that the union may be able to place him on its rolls.[11]   The agency shop arrangement proposed here removes that choice from the union and places the option of membership in the employee while still requiring the same monetary support as does the union shop.   Such a difference between the union and agency shop may be of great importance in some contexts, but for present purposes it is more formal than real. To the extent that it has any significance at all it serves, rather than violates, the desire of Congress to reduce the evils of compulsory unionism while allowing financial support for the bargaining agent.[12]

In short, the employer categorically refused to bargain with the union over a proposal for an agreement within the proviso to § 8 (a)(3) and as such lawful for the pur-

_Tool Makers Lodge,_ 231 F. 2d 298 (C. A. 7th Cir.); _Labor Board_ v. _Mechanics Educational Society of America,_ 222 F. 2d 429 (C. A. 6th Cir.); _Labor Board_ v. _Pape Broadcasting Co.,_ 217 F. 2d 197 (C. A. 5th Cir.); _Labor Board_ v. _Philadelphia Iron Works;_ 211 F. 2d 937 (C. A. 3d Cir.); _Labor Board_ v. _Eclipse Lumber Co.,_ 199 F. 2d 684 (C. A. 9th Cir.); _Utley Company,_ 108 N. L. R. B. 295, enforced, 217 F. 2d 885 (C. A. 6th Cir.); _Washington Waterfront Employers,_ 98 N. L. R. B. 284, enforced, 211 F. 2d 946 (C. A. 9th Cir.); _Electric Auto-Lite Co.,_ 92 N. L. R. B. 1073, enforced, 196 F. 2d 500 (C. A. 6th Cir.).

[11] Cf. _American Seating Co.,_ 98 N. L. R. B. 800, 802, quoted _supra._ note 8, approving a provision protecting those who object on conscientious grounds from being required to become "members" in the conventional sense of that term.

[12] Also wide of the mark is respondent's further suggestion that Congress contemplated the obligation to pay fees and dues to be imposed only in connection with actual membership in the union, so as to insure the enjoyment of all union benefits and rights by those

poses of this case. By the same token, § 7, and derivatively § 8 (a)(1), cannot be deemed to forbid the employer to enter such agreements, since it too is expressly limited by the § 8 (a)(3) proviso. We hold that the employer was not excused from his duty to bargain over the proposal on the theory that his acceding to it would necessarily involve him in an unfair labor practice. Whether a different result obtains in States which have declared such arrangements unlawful is an issue still to be resolved in *Retail Clerks Assn.* v. *Schermerhorn, post,* p. 746, and one which is of no relevance here because Indiana law does not forbid the present contract proposal. In the context of this case, then, the employer cannot justify his refusal to bargain. He violated § 8 (a)(5), and the Board properly ordered him to return to the bargaining table.

*Reversed and remanded.*

MR. JUSTICE GOLDBERG took no part in the consideration or decision of this case.

---

from whom money is extracted. Congress, it is said, had no desire to open the door to compulsory contracts which extract money but exclude the contributing employees from union membership. But, as analyzed by the Board and as the case comes to us, there is no closed-union aspect to the present proposal by the union. Membership remains optional with the employee and the significance of desired, but unavailable, union membership, or the benefits of membership, in terms of permissible § 8 (a)(3) security contracts, we leave for another case. In view of the legislative history of the Taft-Hartley amendments to § 8 (a)(3) and of their purposes, we cannot say that optional membership, which is neither compulsory nor unavailable membership, vitiates an otherwise valid union-security arrangement.