Argued June 4, reversed October 30, 1979

STINES,
*Respondent,*
*v.*
OREGON STATE EMPLOYES
ASSOCIATION,
*Petitioner.*

(ERB No. C-147- 77, CA No. 11356,
SC No. 26033)

601 P2d 799

Bromleigh S. Lamb, Salem, argued the cause and filed the brief and petition for petitioner.

Bruce Bischof of Bryant, Ericson, Jaqua & Bischof, Portland, filed the brief for respondent.

James A. Redden, Attorney General, Walter L. Barrie, Solicitor General, and James C. Rhodes, Assistant Attorney General, Salem, filed a brief for Employment Relations Board.

HOLMAN, J.

## HOLMAN, J.

Plaintiff, a state employe, filed a complaint with the Employment Relations Board (ERB) charging petitioner union and the University of Oregon Health Sciences Center, her employer, with an unfair labor practice following their application to her of the union security provisions contained in their collective bargaining agreement. ERB found the provisions invalid and held that certain actions taken pursuant to them constituted an unfair labor practice within the meaning of ORS 243.672(1)(c). The union sought judicial review in the Court of Appeals, which affirmed ERB's order. 37 Or App 707, 588 P2d 97 (1978). This court granted review.

The parties submitted the case to ERB on stipulated facts. On March 19, 1976, plaintiff signed the union's "Enrollment Form," which contained the following language authorizing deduction of union dues from her paycheck:

"Pursuant to ORS 292.055 and unless notified by me in writing within 10 days of the annual anniversary date of my enrollment I request my employer to deduct monthly from my salary, wages or other sums due me by virtue of my employment the amount of my dues in the Oregon State Employes Association as provided in its by laws and disburse same to the Oregon State Employes Association."

On January 3, 1977, plaintiff submitted to her employer a form entitled "Cancellation of Payroll Deduction," which requested employer to cancel payroll deductions for union dues. By virtue of the provisions of her enrollment, the cancellation could only be effective at the anniversary of plaintiff's enrollment on March 19, 1977.

After plaintiff's submission of her cancellation but prior to its effective date, the union and the employer entered into a collective bargaining agreement, effective March 15, 1977, through August 31, 1978, covering a unit of employes which included plaintiff. Article

[645]

5 of that agreement, entitled "Association Security," stated in relevant part:

> "*Section 1.* All members of the bargaining unit who are members of the Association as of the effective date of the agreement or who subsequently voluntarily become members of the association shall continue to pay dues, or the equivalent, to the Association during the term of this agreement. This section shall not apply during the 30-day period prior to expiration of this Agreement for those employes who, by written notice sent to the Association and the Employer, indicate their desire to withdraw their membership from the Association.

> "*Section 2.* Upon written notice from the Association of the failure of any employe subject to this section to promptly make the payment required hereunder, the Employer will commence deductions of the certified amount of the Association monthly dues from the affected employe(s) paychecks and remit the aggregate amount so collected to the Association."[1] (emphasis added)

---

[1] The above provisions portray a type of union security agreement. Five identified types of union security devices are the closed shop, union shop, agency shop, fair share clauses, and maintenance-of-membership clauses. Zwerdling, Union Security in the Public Sector, 17 Boston Coll. Indus. and Comm. L. Rev. 993, 1005 (1976).

The closed shop requires employees to be union members at the time of their initial employment. The closed shop was outlawed in the private sector by the Taft-Hartley Act. A union shop clause requires all employees in the bargaining unit to join the union, usually within thirty days, and is generally permitted in the private sector. An agency shop clause does not require employees to join the union, but if an employee does not join, he must pay the equivalent of union dues. A fair share clause is a modification of an agency shop agreement and requires nonmembers to pay a sum in lieu of dues based upon the cost of the union's sservices redounding to the benefit of all employees. *See* Zwerdling, *supra* at 1008. The fair share agreement is permitted in Oregon by ORS 243.672(1)(c). *See also,* Brodie, Public Sector Collective Bargaining in Oregon, 54 Or L Rev 337, 365 (1975). Maintenance-of-membership clauses require that those who are union members as of the date of the collective bargaining agreement, or who join thereafter, must continue membership for some period set forth in the agreement. Maintenance-of-membership clauses are sometimes classified as union security devices; however, unlike union shop, agency shop, and fair share clauses, maintenance-of-membership agreements do not require persons who do not voluntarily join the union to bear a share of the costs of union representation. *Cf.* Zwerdling, *supra,* at at 1005, n.78.

A "Memorandum of Agreement" signed by the union and employer effective March 15, 1977, states:

> "The Association agrees that it will indemnify, defend and save the Employer harmless from all suits, actions, proceedings and claims against the employer or persons acting on behalf of the Employer whether for damages, compensation, reinstatement, or any combination thereof, arising out of the Employer's implementation of Article [5] (Association Security) of the Collective Bargaining Agreement made and entered into by and between University of Oregon Health Sciences Center and The Oregon State Employes Association."

Employer's payroll department notified the union of respondent's dues cancellation and the union requested that the employer comply with Section 2 of Article 5 of the contract and deduct the amount of the dues from plaintiff's paycheck. That same day, the union notified plaintiff that her attempt to cancel the payroll deduction of dues was contrary to the collective bargaining contract with employer. Employer resumed deducting petitioner's dues from plaintiff's monthly paychecks.

ORS 292.055, which deals with deduction of union dues from salaries of state employes, provides that:

> "(3) Unless there is a contract to the contrary, upon receipt by him of the request in writing of such officer or employe so to do, such state official shall cease making such deductions and payments."

Since plaintiff requested termination of her union dues deduction and the union requested the employer to continue the deductions pursuant to Article 5 of the collective bargaining agreement, an issue is presented whether or not Sections 1 and 2 of that Article are valid. ERB concluded that they were invalid but held that the enrollment form properly prevented plaintiff's request to cancel the deduction from becoming effective until March 19, 1977. It held that after that

date, however, the employer's resumption of the deduction was an unfair labor pracice within the meaning of ORS 243.672(1)(c). In view of the "save harmless" agreement and the union's role in the incident, ERB concluded that the appropriate remedy was to require the union to reimburse plaintiff for all union dues deducted from her salary, with interest, and to require the union and employer to cease and desist implementing Article 5 of the agreement, posting notices of their action.

At the time in question, ORS 243.672(1)(c), the relevant statute for determining the validity of these provisions, read:

"(1) It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"* * * * *.

"(c) Discriminate in regard to hiring, tenure or any terms or condition of employment for the purpose of encouraging or discouraging membership in an employe organization. Nothing in this section is intended to prohibit the entering into of a fair-share agreement between a public employer and the exclusive bargaining representative of its employes. If such a 'fair-share' agreement has been agreed to by the public employer and exclusive representative, nothing shall prohibit the deduction of the payment-in-lieu-of-dues from the salaries or wages of such employes."

In addition, ORS 243.650 provided that:

"As used in ORS 243.650 to 243.782, unless the context requires otherwise:

"* * * * *.

"(10) 'Fair-share agreement' means an agreement between the public employer and the recognized or certified bargaining representative of public employes whereby employes who are not members of the employe organization are required to make an in-lieu-of-dues payment to an employe organization. Such agreement shall reflect the opinion of a majority of the employes in the bargaining unit.

"* * * * *.

"(16) 'Payment-in-lieu-of-dues' means an assessment to defray the cost for services by the exclusive representative in negotiations and contract administration of *all persons* in an appropriate bargaining unit who are not members of the organization serving as exclusive representative of the employes. The payment shall be equivalent to regular union dues and assessments, if any, or shall be an amount agreed upon by the public employer and the exclusive representative of the employes." (Emphasis added.)

ORS 243.672(1)(c) makes it an unfair labor practice for a public employer to discriminate in regard to any terms or conditions of employment for the purpose of encouraging membership in an employe organization. Here, the public employer and the union entered into an agreement which required anyone who was a member of the union on the effective date of the agreement or who subsequently voluntarily became a member of the union to continue paying dues, or the equivalent, to the union during the term of the agreement. The agreement does not say that such persons must remain members of the union, although it does require them to continue paying dues or the equivalent.

Requiring employes to continue paying dues or the equivalent has the effect of encouraging them to maintain their membership in the union since they will logically wish to enjoy that for which they have already paid. Enforcement of the agreement would therefore constitute an unfair labor practice unless the agreement falls within the exception set forth in ORS 243.672(1)(c) for "fair share" agreements or is a less severe form of union security arrangement than a fair share agreement would be, under the rule of *Labor Board v. General Motors,* 373 US 734, 83 S Ct 1453, 10 L Ed 2d 670 (1963), as applied by the Court of Appeals in *OSEA v. Oregon State University,* 30 Or App 757, 567 P2d 1085 (1977).

█ It is our conclusion, contrary to that of the Court of Appeals, that the collective bargaining agreement is not the equivalent of a fair share agreement as defined

[649]

by the Oregon statutes. A "fair share" agreement is defined as one where nonmembers of the union are required to make payment-in-lieu-of-dues to the union. "Payment-in-lieu-of-dues" is defined as an assessment to defray the union's cost of representing *all persons* in the bargaining unit who are not members of the union. No such arrangement has ever been effectuated here, and members of the bargaining unit who have never joined the union pay nothing. The agreement in question requires payments only of those nonunion members in the bargaining unit who have been union members during the term of the collective bargaining agreement and who have dropped out of the union. As such it is not a "fair share" arrangement because it does not require contribution by "all persons."

■ Fair share agreements by definition require all nonmember employes to bear their share of the union's representation expenses notwithstanding their refusal to join the union or their strong opposition to the union. By contrast, the agreement in this case affects only employes who *voluntarily* choose to join the union and later choose to terminate membership. We do not read Article 5, sections (1) and (2), of the agreement between the union and the employer as requiring a union member to continue membership if he or she does not wish to do so. We read Article 5 as saying that if a member wishes to abandon membership, the member may do so but only by continuing to pay dues or the equivalent.

■ We conclude that the provision of the agreement which plaintiff attacks is a "maintenance-of-membership" provision and that it is less restrictive than a "fair share" provision which is permissible in Oregon. It is less restrictive because it only applies to those who have willingly and voluntarily joined the union, while "fair share" includes everyone who is not a member of the union whether they have ever joined or not. Being less restrictive than "fair share" and "fair share" being permissible in Oregon, it follows

under *General Motors, supra,* that the provision is legal and permissible and may be enforced by the union and the employer.

The question arises whether, because of the statutory requirement that "fair share" can only be adopted by a vote of the entire bargaining unit, the application of the rule of the *General Motors* case is inappropriate. *General Motors* held that statutory permission for a certain kind of union security agreement implied permission for any less stringent union security agreement. However, in *General Motors* there was no provision for a vote of the entire bargaining unit before the statutorily permitted union security agreement went into effect. When the statutory security agreement is permissible only upon a vote, what are the implications concerning the permissibility of a less stringent agreement? It is our conclusion that the application of the *General Motors* rule would still be appropriate here. Since "fair share" affects all persons in the bargaining unit, the vote requirement is necessary for fairness. The maintenance of membership agreement, in contrast, affects only persons who, during the life of the contract, have chosen to be union members. Those members of the bargaining unit who have never been members of the union could have no possible interest in such a maintenance-of-membership agreement. Therefore, it would be unreasonable to assume that the legislature intended that the *General Motors* rule, which was on the books at the adoption of the statutory scheme, not be applicable because of the required vote as a prerequisite to "fair share."

■ One additional problem arises. Can the union enter into a collective bargaining agreement which deprives the plaintiff of her rights promised her in their contract? Under her contract with the union plaintiff could cancel her dues at the end of her first year as an employe. She attempted to exercise this right, but four days before her cancellation went into effect, the collective bargaining agreement became effective. It required that she pay dues until the termination of that

agreement, which was more than a year later. However, during this entire period ORS 292.055(3) was in effect. It provides that when the employer receives a request in writing from the employe to terminate deduction from his wages for union dues, the deduction must terminate unless "there is a contract to the contrary." We conclude that in the context in which ORS 292.055 is found the statute can only mean a contract between the union and the employer. In subsection (4) of the same statute there is a provision that no deductions for payments to any labor organization under the section shall be deemed an unfair labor practice under ORS 243.672. ORS 292.055 having been in existence at the time of the agreement by which plaintiff joined the union, the parties are in the position of having contracted with the imputed knowledge that the union had the right to negate its promises by contracting with the employer "to the contrary."

The decision of the Court of Appeals is reversed, and the case is remanded to ERB with instructions to dismiss plaintiff's complaint.