56 F.3d 1438
 149 L.R.R.M. (BNA) 2578, 312 U.S.App.D.C.
368, 64 USLW 2047,
130 Lab.Cas. P 11,352
 James GILBERT, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
International Brotherhood of Boilermakers, Iron Ship
Builders, Blacksmiths, Forgers and Helpers,
AFL-CIO, Intervenor.
 No. 94-1081.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 13, 1995.
Decided June 16, 1995.
Rehearing and Suggestion for Rehearing In Banc Denied Aug. 16, 1995.
 
 On Petition for Review of an Order of the National Labor Relations Board.
 Raymond J. LaJeunesse, Jr., argued the cause and filed the briefs for petitioner.
 David A. Fleischer, Sr. Atty., N.L.R.B., argued the cause for respondent. With him on the brief were Linda R. Sher, Acting Associate Gen. Counsel and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B. Charles P. Donnelly, Supervisory Atty., N.L.R.B., entered an appearance.
 Dana K. Apple argued the cause for intervenor. With her on brief was Michael J. Stapp. Robert J. Henry entered an appearance.
 Before: EDWARDS, C.J., and WILLIAMS and ROGERS, Circuit Judges.
 Opinion for the Court filed by Chief Judge EDWARDS.
 HARRY T. EDWARDS, Chief Judge:
 
 
 1
 In 1988, petitioner James Gilbert was president of Local D-100 of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers ("Boilermakers" or "Union"), which represented a unit of employees at the Kaiser Cement Corporation ("Company") in California. During that year, Gilbert and several other members of the local advocated certain proposals that would have undermined the strength of the Union within the bargaining unit. Charges were filed against Gilbert and the other dissident members, and, upon finding them guilty, the Union barred them from holding any Union office or attending most Union meetings for several years. Although Gilbert and the other officers never resigned their membership in the Union, they asserted that, because of the discipline imposed on them, they were no longer obligated to pay membership dues. When Gilbert stopped paying his dues, the Union threatened to have him discharged from his employment with the Company pursuant to a union-security agreement between the Union and the Company, requiring bargaining unit employees to pay Union dues as a condition of continued employment.
 
 
 2
 Gilbert thereafter filed an unfair labor practice charge against the Union with the National Labor Relations Board ("NLRB" or "Board"), alleging that the Union's threat to seek his discharge under the union-security agreement violated the National Labor Relations Act ("NLRA" or "Act"). The Board dismissed Gilbert's complaint, holding that the Union did not violate section 8(b)(1)(A) of the Act, 29 U.S.C. Sec. 158(b)(1)(A) (1988), by demanding that he pay dues. The Board found that, because the disciplinary action itself did not violate the Act, Gilbert remained obligated under the union-security agreement to pay "periodic dues and the initiation fees uniformly required." Id. Sec. 158(a)(3) (1988). Accordingly, the Board concluded that the Union acted lawfully when it gave Gilbert a choice to either pay membership dues or sacrifice his job pursuant to the union-security agreement.
 
 
 3
 Gilbert raises two challenges to the Board's decision. First, he contends that the result reached by the Board is impermissible under the second proviso to section 8(a)(3) of the Act, which prohibits a union from enforcing a union-security provision against an employee (1) if union membership is not "available" to that employee on the same terms applicable to other employees, or (2) if the employee's membership is "denied or terminated" for reasons other than the nonpayment of membership dues. Id. Second, he claims that the Board's decision is arbitrary and capricious, because it constitutes an unexplained departure from a line of Board precedent holding that a union violates section 8(b)(1)(A) of the Act if it requires the payment of dues as a condition of employment when the union has imposed certain types of discipline on an employee for exercising a right guaranteed by section 7 of the Act, id. Sec. 157 (1988).
 
 
 4
 We reject both contentions. First, the Union's actions in this case clearly did not violate the second proviso to section 8(a)(3). That proviso protects employees from discharge under a union-security agreement only when membership was not "available" to such employees on the same terms as other employees, or when the membership of such employees has been "denied or terminated" for any reason other than nonpayment of dues. In this case, Gilbert's membership was always "available" to him on the same terms as other employees, for the Union never imposed any conditions on Gilbert's membership that were not applicable to other members. Moreover, Gilbert's membership was never "denied or terminated," because he never ceased being a member of the Union during the relevant period. Rather, the discipline imposed on him was merely a lawful incident of his continued membership in the Union, imposed for violating rules that applied to every other Union member. Furthermore, because we find that the Board's dismissal of Gilbert's complaint in this case is consistent with NLRB precedent, we reject Gilbert's contention that the Board's decision was arbitrary and capricious. Accordingly, we deny the petition for review.
 
 I. BACKGROUND
 A. Union-Security Agreements Under the NLRA
 
 5
 Although section 8(a)(3) of the NLRA generally makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization," see 29 U.S.C. Sec. 158(a)(3), that section contains two provisos authorizing union-security agreements between employers and unions. The first proviso authorizes a union and an employer to contract to require as a condition of employment that all employees in the bargaining unit establish and maintain "membership" in the union. Id. The second proviso requires that such membership must, inter alia, be equally available to all and obligate employees to do no more than "tender the periodic dues and the initiation fees uniformly required." Id. Thus, under established law, section 8(a)(3) has been construed to allow an employer and the employees' exclusive bargaining representative to enter into an agreement requiring all employees in the bargaining unit to pay periodic union dues and initiation fees as a condition of continued employment, whether or not the employees wish to become full union members.
 
 
 6
 Despite the broad meaning that might be implied by the term "membership" in the first proviso of section 8(a)(3), the Supreme Court has held that the section's second proviso mandates that such union membership is "whittled down to its financial core." NLRB v. General Motors Corp., 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963); see International Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. NLRB, 41 F.3d 1532, 1534 (D.C.Cir.1994) ("IUE v. NLRB "). Accordingly, "[i]t is well settled that causing or attempting to cause an employer to discharge an employee for breach of any union membership requirements other than failure to pay the financial core obligations of uniform initiation fees and dues violates the Act, specifically sections 8(b)(2) and 8(b)(1)(A)."[1] IUE v. NLRB, 41 F.3d at 1534 (citing Union Starch & Ref. Co., 87 N.L.R.B. 779, 787 (1949), enforced, 186 F.2d 1008 (7th Cir.), cert. denied, 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617 (1951)). In its most recent decision in this area, Communications Workers v. Beck, 487 U.S. 735, 745, 108 S.Ct. 2641, 2648, 101 L.Ed.2d 634 (1988), the Supreme Court held that section 8(a)(3) does not oblige employees "to support union activities beyond those germane to collective bargaining, contract administration, and grievance adjustment." The Court thus "limited employee obligations under union-security agreements to comport with the congressional purpose of eliminating the problem of 'free riders,' i.e., employees who would receive the benefits of union representation but refuse to pay their fair share of the costs." IUE v. NLRB, 41 F.3d at 1535 (citing Beck, 487 U.S. at 747-54, 108 S.Ct. at 2649-53).
 
 B. The Present Dispute
 
 7
 The facts in this case are not in dispute. Prior to 1984, Local 100 of the Cement, Lime, Gypsum and Allied Workers International Union ("Cement Workers") represented the relevant bargaining unit employees at the Company's Permanente, California facility. The collective bargaining representative for all bargaining unit employees at that facility was the AFL-CIO Building Trades Council. In April 1984, the Cement Workers merged with the Boilermakers, and Local 100 became Local D-100 of the Union.
 
 
 8
 Gilbert had been president of the local since 1977 and remained president after the merger. He and several other employees became dissatisfied with the Union when it terminated four long-term Cement Workers' international representatives. In a letter dated September 16, 1986, Gilbert requested that the termination of one of the fired international representatives be reconsidered, but the Union refused. Later, in July 1988, Gilbert prepared and circulated a petition requesting a Board election so that the bargaining unit employees could replace the Union with a new bargaining representative. All but one of the employees in the unit signed the petition, but it was never filed with the Board.
 
 
 9
 On September 22, 1988, at a meeting of Local D-100's membership, Gilbert presented a "Letter of Understanding" written by the Company, which proposed to convert the jobs of 17 unit employees, including Gilbert's, to salaried supervisory positions, thereby removing them from the bargaining unit. While Gilbert took no formal position on the proposal, he described the proposal's benefits as the Company had represented them. Local D-100 Financial Secretary Donald Hall attended the meeting, but also took no position on the proposal. Unit employee Arthur Rose spoke in favor of it. The bargaining unit employees ultimately rejected the proposal by a vote of 23 to 11. About two weeks after the September 22 meeting, Joseph Gaxiola, a trustee of Local D-100, circulated a petition asking for the members' views on a proposal to make all bargaining unit positions salaried, thereby eliminating the unit. Gaxiola supported the proposal, but again a majority of the unit employees opposed it.
 
 
 10
 In October 1988, a bargaining unit employee filed internal Union charges against Gilbert, Hall, Rose, and Gaxiola, alleging that the four employees had engaged in activities in support of removing a number of persons from the bargaining unit. After a hearing before an international representative, the Union found the four employees guilty of all charges and subsequently barred them from holding any Union office or attending any Union meetings, except those called to vote on the ratification of a contract directly affecting them. These penalties were to apply to Gilbert for five years, Hall for three years, and Gaxiola and Rose for two years.
 
 
 11
 In April 1989, in a joint letter to Union president Charles W. Jones, the four disciplined employees asserted that they had been effectively suspended from the Union and therefore no longer were obligated to pay union dues. In a letter dated May 22, 1989, Jones responded that the four employees had not been suspended and must continue to pay dues in order to remain members of the Union in good standing. In a subsequent letter dated July 20, 1989, the disciplined employees inquired as to what penalties might be imposed on them if they stopped paying dues. Jones replied that the Union's contract with the Company contained a union-security clause and that, if the four employees ceased paying dues, the Union would so notify the Company, and the employees would no longer be permitted to work at the plant. Nevertheless, Gilbert stopped paying his dues for two months. He resumed payment, however, when the Company notified him that the Union had requested his discharge under the union-security agreement. Gilbert was thus never dismissed from his employment.
 
 C. Board Proceedings
 
 12
 On October 6, 1989, Gilbert filed an unfair labor practice charge against the Union with the NLRB, and, on December 14, 1989, the General Counsel issued a complaint. The Administrative Law Judge ("ALJ") rejected the General Counsel's first contention that the Union had unlawfully disciplined Gilbert and the three other subject employees. He found that the Union had the right to protect itself against the activities of the four disciplined employees, which could have resulted in the erosion or elimination of the bargaining unit that the Union represented. Kaiser Cement Corp., 312 N.L.R.B. 218, 227-28, 1993 WL 371612 (1993) ("NLRB Decision") (reprinting ALJ decision). Therefore, the ALJ concluded that the General Counsel had not established a prima facie case that the discipline violated section 8(b)(1)(A). Id. at 228, 1993 WL 371612. On this point, the judge noted that the Union's internal rules had been reasonably enforced against the four employees, who at all times were free to leave the Union to escape those rules, but had not done so. Id.
 
 
 13
 The ALJ next held that the Union did not violate the Act by threatening to invoke the union-security agreement. In this regard, the judge first found that the union's threat to invoke the agreement was lawful, because the employees had not been disciplined for the exercise of any rights protected by section 7 of the Act. Id. Because no section 7 rights were involved, the ALJ distinguished this case from cases relied on by the General Counsel, in which the Board held that a union violated section 8(b)(1)(A) of the Act by threatening to invoke a union-security clause against employees who had been disciplined in various ways for the exercise of certain section 7 rights. Id. (citing Steelworkers Local 4186 (McGraw Edison Co.), 181 N.L.R.B. 992 (1970)).
 
 
 14
 Finally, the ALJ rejected the General Counsel's alternative argument that, even if the activities for which the subject employees were disciplined were not protected, their membership rights were so substantially reduced that enforcement of the union-security clause against them became unlawful. Id. This argument, in the ALJ's view, presented the Union with the "Hobson's choice" of either forgoing its right to discipline members under the proviso to section 8(b)(1)(A),[2] thereby rendering that proviso a nullity, or relinquishing its right to enforce the provisions of a valid union-security agreement, thereby ultimately self-destructing without the dues of disciplined members. Id. The ALJ concluded that the General Counsel's position, if implemented, would induce any members who are unwilling to pay dues in the first place for financial or philosophical reasons to subject themselves to union discipline "so they would be 'punished,' by not having to pay union dues, although they would continue their employment." Id.
 
 
 15
 The Board affirmed. The Board first found that the Union had lawfully disciplined Gilbert and the other employees. Id. at 220, 1993 WL 371612. The Board initially noted that there are certain limitations on a union's right to discipline members. For instance, employee-members are always free to resign their membership, and thus escape union rules and discipline. However, the Board stated that employees who "have opted for continued membership ... cannot be heard to complain if the union enforces the rules of membership." Id. Another limitation on internal union discipline, the Board continued, is where a union rule "impairs a policy that Congress has embedded in the labor laws." Id. For example, a union may not discipline a member for exercising the "fundamental" section 7 right of seeking access to the Board (i.e., filing a petition or charge with the Board). Id. In this case, however, the Board found no such fundamental policy implicated by the disciplined members' actions. The Board also found that Gilbert and the others were at all times free to resign their membership, but chose not to do so. Thus, the Union was free to discipline them, and "[t]he fact that the Union chose to discipline them by impairing their membership, rather than by expelling them or fining them, does not transform lawful discipline into unlawful discipline." Id.
 
 
 16
 The Board next held that the Union's enforcement of the union-security agreement against the employees whose membership lawfully had been impaired did not violate the Act. The Board stated that, "[b]ecause the [Union's] discipline of these members did not violate the Act, the members continued, as unit employees, to be required under the union-security agreement to satisfy the sole obligation a union may enforce under a union-security provision: the tendering of uniform initiation fees (if any) and dues." Id. (internal quotations and footnote omitted). The Board thus concluded that the Union "did not violate Section 8(b)(1)(A) of the Act by threatening to invoke the union-security clause against Gilbert and the three other employee-members if they ceased paying dues after the [Union] disciplined them." Id.
 
 II. ANALYSIS
 
 17
 Gilbert challenges the Board's decision on two grounds. He initially claims that the result reached by the Board is impermissible under the second proviso to section 8(a)(3) of the Act. He next argues that the NLRB's decision is arbitrary and capricious, because the Board departed from its own precedent without adequate explanation. We reject both contentions.
 
 A. NLRA Section 8(a)(3)
 
 18
 As noted above, a union's threat to invoke a facially valid union-security agreement to cause the discharge of an employee for any reason other than nonpayment of dues or initiation fees violates section 8(b)(1)(A) of the Act. See IUE v. NLRB, 41 F.3d at 1534. Gilbert contends that the result reached by the Board--that the Union did not violate the Act by threatening to invoke the union-security agreement unless Gilbert paid his union dues--was impermissible under the second proviso to section 8(a)(3). In making this argument, Gilbert first contends that the Union's discipline against him "substantially impaired" his membership rights, because he no longer was permitted to hold office in the Union, attend most Union meetings, or vote on most Union matters. This substantial impairment, Gilbert argues, placed him squarely within both of the conditions set forth in section 8(a)(3)'s second proviso because: (1) membership was not "available" to him on the same terms and conditions as other employees; and (2) his membership had been effectively "denied or terminated" for reasons other than nonpayment of periodic dues uniformly required. Accordingly, Gilbert concludes, the Union's threat to enforce the union-security agreement against him (unless he paid his dues) violated section 8(a)(3), and was thus an unfair labor practice under section 8(b)(1)(A).
 
 
 19
 The Board rejected Gilbert's contention, finding that he remained obligated under the union-security agreement to pay dues after he was disciplined, and concluding that the Union's threat to invoke the union-security agreement unless he paid those dues did not violate the Act. We agree. In reviewing the Board's decision, we must accept the NLRB's reasonable construction of section 8(a)(3). See Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). We also must uphold the Board's factual findings if, viewing the record as a whole, they are supported by substantial evidence. See IUE v. NLRB, 41 F.3d at 1536-37. Here, we conclude that the Board's decision is based on a reasonable construction of section 8(a)(3) and is supported by substantial record evidence.
 
 
 20
 First, with respect to the first condition of section 8(a)(3)'s second proviso, the mere fact that Gilbert was deprived of certain membership privileges as discipline for violating valid internal Union rules that applied uniformly to every other member[3] does not mean that membership was not "available" to Gilbert on the same terms and conditions as other employees. Membership was offered to Gilbert on the same terms as it was to other employees. This membership, however, included both rights and obligations. When Gilbert freely chose to violate his obligations, he was disciplined just as any other member would have been. And nothing in the record suggests that other members found guilty of similar violations of the Union's internal rules were punished less severely than Gilbert. Absent any such evidence, the only reasonable conclusion is the one reached by the Board--membership in the Union was "available" to Gilbert on the same terms and conditions as it was to other employees.
 
 
 21
 It is equally clear that the Union's impairment of Gilbert's membership rights did not place him within the second condition to section 8(a)(3)'s second proviso. This part of the proviso protects employees from discharge under a union-security agreement if their union membership is "denied or terminated" for any reason, however lawful, other than nonpayment of dues. 29 U.S.C. Sec. 158(a)(3). However, even accepting Gilbert's characterization that his membership rights were "substantially impaired" for reasons other than nonpayment of dues, the fact remains that his Union membership was never "denied" or "terminated." Gilbert was specifically told by the Union following his discipline that his membership had not been suspended, and Gilbert chose not to resign his membership. Gilbert thus remained at all relevant times a full member of the Union. The discipline imposed on him was merely an incident of that continued membership in the Union. Moreover, the Board's decision not to equate the discipline imposed on Gilbert with a "denial" or termination" within the meaning of the final proviso to section 8(a)(3) is clearly reasonable.
 
 
 22
 Furthermore, Gilbert's contention that a union may not lawfully compel the payment of dues from a member against whom the union has imposed lawful discipline flies in the face of the Supreme Court's decision in Beck. While the Court in Beck held that unions may not, pursuant to union-security agreements, exact from unwilling employees sums used to finance activities that go beyond the union's collective bargaining and representational obligations, 487 U.S. at 745, 108 S.Ct. at 2648, the Court made clear that unions need not tolerate free riders, i.e., employees who would receive the benefits of union representation but refuse to pay their fair share of the costs, id. at 750, 108 S.Ct. at 2651 ("Congress' decision to allow union-security agreements at all reflects its concern that ... the parties to a collective bargaining agreement be allowed to provide that there be no employees who are getting the benefits of union representation without paying for them.") (internal quotations omitted). Yet, free riders are exactly what Gilbert urges this court to sanction. Under Gilbert's theory, an employee would be free to avoid his or her financial obligation to a union merely by flouting the union's rules, submitting to discipline similar to that imposed on Gilbert, and then refusing to pay any membership dues on the ground that his or her membership rights had been "substantially impaired." Remaining in the bargaining unit, such an employee still would be entitled to the benefits of union representation, but would not be required to pay dues. Such a result is surely inconsistent with Beck.
 
 B. Prior Board Precedent
 
 23
 Gilbert next contends that, even if the result reached by the Board is permissible under section 8(a)(3), the Union's actions in this case still violated section 8(b)(1)(A). Gilbert points to a line of authority, beginning with Steelworkers Local 4186 (McGraw Edison Co.), 181 N.L.R.B. 992 (1970), holding that unions may not demand, on pain of discharge under a union-security agreement, that members who have been subjected to certain types of discipline for activity protected by section 7 of the Act continue to pay dues. Thus, according to Gilbert, the Board's determination in this case that there was no violation of section 8(b)(1)(A) is arbitrary and capricious, because it constitutes an unexplained departure from the Board's prior decisions. We disagree.
 
 
 24
 It is, of course, elementary that an agency must conform to its prior decisions or explain the reason for its departure from such precedent. See Greater Boston Tel. Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if any agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.") (footnote omitted), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983). However, as we stated in Hall v. McLaughlin, 864 F.2d 868, 872 (D.C.Cir.1989), "[w]here the reviewing court can ascertain that the agency has not in fact diverged from past decisions, the need for a comprehensive and explicit statement of its current rationale is less pressing." We further noted in Hall that, where the circumstances of the prior cases are sufficiently different from those of the case before the court, an agency is justified in declining to follow them, and the court may accept even a "laconic explanation as an 'ample' articulation of its reasoning." Id. at 873 (citing United Mun. Distribs. Group v. FERC, 732 F.2d 202, 211 (D.C.Cir.1984)); see also West Coast Media, Inc. v. FCC, 695 F.2d 617, 621 (D.C.Cir.1982) (holding that agency had engaged in "eminently reasonable" decisionmaking when it distinguished an asserted precedent by merely reciting factual differences between prior case and one before it), cert. denied, 464 U.S. 816, 104 S.Ct. 74, 78 L.Ed.2d 87 (1983). We thus concluded that, "if the court itself finds the past decisions to involve materially different situations, the agency's burden of explanation about any alleged 'departures' is considerably less." Hall, 864 F.2d at 873; see also New England Grain & Feed Council v. ICC, 598 F.2d 281, 285 (D.C.Cir.1979) ("While we are somewhat disturbed by the Commission's failure to explain why [an asserted precedent] is inapplicable here, that case is sufficiently distinguishable to assure that the Commission's oversight does not present a danger that it has arbitrarily departed from its own precedents."). Following this rationale, we recently held that an agency "may distinguish precedent simply by emphasizing the importance of considerations not previously contemplated, and that in so doing it need not refer to the cases being distinguished by name." Environmental Action v. FERC, 996 F.2d 401, 411-12 (D.C.Cir.1993).
 
 
 25
 Applying these standards to the case at hand, we find that the decision of the Board must be upheld. Gilbert argues that this case is controlled by a line of six Board decisions beginning with McGraw Edison, and culminating with Machinists District 94 (McDonnell Douglas), 283 N.L.R.B. 881, 1987 WL 89622 (1987). As noted above, these cases have held, under varying factual circumstances, that a union violates section 8(b)(1)(A) of the Act by invoking a lawful union-security clause to enforce the payment of dues where employees have been subjected to certain types of discipline for exercising a right guaranteed by section 7 of the Act. However, because all but one of these cases are "sufficiently distinguishable" from the case at hand, and because we can discern the path of the Board's position, we are satisfied that the Board has not departed from its precedent. With respect to the one case cited by Gilbert that is arguably on point, McDonnell Douglas, we find that the Board's decision here provided adequate reasoning for and notice of the Board's departure from that case.
 
 
 26
 First, the McGraw Edison line of cases all involved unions' discipline of members for exercising rights guaranteed under section 7 of the Act. Indeed, if no section 7 rights had been involved, the Board in McGraw Edison and its progeny could not have found violations of section 8(b)(1)(A), because that section creates an unfair labor practice only when a union restrains or coerces an employee "in the exercise of the rights guaranteed in [section 7]." 29 U.S.C. Sec. 158(b)(1)(A). In this case, however, the ALJ found that Gilbert was disciplined for activity that did not constitute conduct protected by section 7. NLRB Decision, 312 N.L.R.B. at 228 ("I have found that the alleged discriminatees were not disciplined for the exercise of any rights protected by Section 7 of the Act."). Based on this conclusion, the ALJ properly held that the McGraw Edison line of cases are inapplicable. In affirming the ALJ's findings and conclusions, the Board did not take issue with the ALJ's conclusion that the activity resulting in Gilbert's discipline was not conduct protected by section 7. See id. at 218-20. Obviously, if the Board meant to say that section 7 rights were not involved here--and there is no reason to believe that they meant to say otherwise--then McGraw Edison and its progeny are inapplicable to this case.
 
 
 27
 In any event, it seems quite clear that McGraw Edison is inapposite. In McGraw Edison, 181 N.L.R.B. at 992, the union disciplined an employee for filing a decertification petition with the Board. When the employee indicated his intention not to pay dues after the significant impairment of his membership rights (the union had suspended his rights to attend union meetings for over one year and barred him from holding office indefinitely), the union threatened to invoke a union-security clause to enforce payment of the dues. Id. The Board held that the union's threat violated section 8(b)(1)(A), because it "constituted a continuing form of coercion tending to operate as a serious restraint upon access to Board processes." Id. In this case, the Board stated that the right of seeking access to the Board is a "fundamental" section 7 right, because all other rights under the Act are dependent on it. NLRB Decision, 312 N.L.R.B. at 220 & n. 7. However, the Board properly concluded that Gilbert's conduct did not involve one of those so-called "fundamental" section 7 rights.
 
 
 28
 Moreover, four of the five post-McGraw Edison cases relied on by Gilbert are clearly distinguishable from this case. In each of those four cases, the union sought to enforce a union-security clause on employees who had either been denied membership, see Communications Workers Local 1104 (New York Tel. Co.), 211 N.L.R.B. 114, 116-17, 1974 WL 5130 (1974), enforced, 520 F.2d 411 (2d Cir.1975), cert. denied, 423 U.S. 1051, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976), expelled from membership, see Communications Workers Local 9509 (Pacific Tel. & Tel. Co.), 193 N.L.R.B. 83, 83 (1971), or fully suspended from membership, see Inland Boatmen's Union (Dillingham Tug & Barge Co.), 276 N.L.R.B. 1261, 1262-66, 1985 WL 46305 (1985), further proceedings, 278 N.L.R.B. 83, 1986 WL 54066 (1986); Telephone Traffic Union (New York Tel. Co.), 241 N.L.R.B. 826, 827, 1979 WL 8958 (1979), for engaging in various section 7 activities. Thus, each of these cases involved situations in which a union stripped an employee-member of all rights and privileges of union membership. However, no such situation is involved here, for in this case the Union merely imposed routine discipline on an employee who voluntarily retained his membership in the union.[4] Thus, the Board's failure to address these cases in its opinion can hardly be deemed an unexplained "departure" from precedent, because the rule of these cases is simply inapplicable to the case before us.[5]
 
 
 29
 Finally, the only post-McGraw Edison case cited by Gilbert that is arguably on point is Machinists District 94 (McDonnell Douglas Corp.), 283 N.L.R.B. 881, 1987 WL 89622 (1987). In affirming an ALJ's decision, the Board in McDonnell Douglas held that a union violated section 8(b)(1)(A) of the Act when it threatened to invoke (for nonpayment of dues) a union-security agreement against several employees who had been forbidden by the union from holding union office for five years as discipline for engaging in certain section 7 activities. Id. at 892-93. Thus, the Board appeared to extend the holding of McGraw Edison and its progeny to a case where the union's discipline resulted in only the substantial impairment of an employee's membership rights. Id. However, the Board's actual holding in McDonnell Douglas is of little moment here, because (1) the employees were disciplined for engaging in section 7 activities, and (2) the subject employees had actually resigned from the union prior to being disciplined. Id. at 885, 892-93, 1987 WL 89622. Where an employee has resigned from a union, the union has no power to discipline the former member. See NLRB v. Textile Workers Local 1029, 409 U.S. 213, 217, 93 S.Ct. 385, 387, 34 L.Ed.2d 422 (1972). Thus, it is hard to view McDonnell Douglas as an "impairment" case, as Gilbert would have it. Rather, it is really a case where the union improperly attempted to discipline employees who were no longer members. In short, McDonnell Douglas is clearly inapposite to this case.
 
 
 30
 Even if McDonnell Douglas is fairly viewed as an "impairment" case, we think the Board's decision in this case provided adequate reasoning for and notice of the Board's departure from that precedent. The contours of the Board's holding in this case are readily discernable--a union security clause may "be enforced against those whose membership has been lawfully impaired." NLRB Decision, 312 N.L.R.B. at 220 (emphasis added). And when the case before us is read in conjunction with McGraw Edison and its progeny, we can discern the following rule: For a union lawfully to demand, as a condition of continued employment, the continued payment of dues from a member who has been disciplined, two conditions must be met: (1) the discipline imposed on the employee must not result in the denial, termination, or full suspension of the employee's membership, and (2) the discipline itself must not impair the exercise of a "fundamental" section 7 right (e.g., the right of seeking access to the Board's processes).[6] Id. Thus, even though the Board never mentioned McDonnell Douglas by name, we can discern the Board's position based on its holding and reasoning in this case, which in relatively clear terms signals the Board's departure from any contrary rule that arguably might be gleaned from McDonnell Douglas. And, by emphasizing that mere impairment of membership rights is insufficient in cases such as this to support an unfair labor practice finding under section 8(b)(1)(A), and by stressing the overriding importance of "fundamental" section 7 rights, the Board has adequately signaled the reasons for its changed position.
 
 
 31
 Furthermore, the Board's decision is eminently reasonable in light of the Supreme Court's decision in Beck.[7] Beck, in clear terms, permits unions to use union-security provisions to avoid the problem of free riders. A rule prohibiting a union from enforcing such a provision against its members, merely because they were subjected (as Gilbert was here) to routine internal discipline, would create a free rider out of every union member who was subjected to lawful discipline for violating valid union rules and who no longer desired to pay dues. Such a result is clearly inconsistent with the Act, specifically section 8(a)(3), and the Court's interpretation of the Act in Beck.
 
 III. CONCLUSION
 
 32
 For the foregoing reasons, the petition for review is denied.
 
 
 33
 So ordered.
 
 
 
 [1]
 In this case, Gilbert charged the Union only with violating section 8(b)(1)(A), which makes it unlawful for a union "to restrain or coerce ... employees in the exercise of the rights guaranteed in [section 7 of the Act]." 29 U.S.C. Sec. 158(b)(1)(A). Section 7 of the Act gives employees the right to engage in a range of activities in support of collective bargaining, but also gives employees "the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section [8(a)(3) of the Act]." Id. Sec. 157
 
 
 [2]
 The proviso to section 8(b)(1)(A) provides that the prohibitions of that section "shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." Id. Sec. 158(b)(1)(A)
 
 
 [3]
 Gilbert does not dispute that the Union's internal rules were valid and applied uniformly to all members
 
 
 [4]
 The critically different nature of the discipline involved in these post-McGraw Edison cases is also evidenced by the additional unfair labor practice findings made in those cases. In all but one of these cases, the Board held that, in addition to violating section 8(b)(1)(A), the union had also violated sections 8(a)(3) and 8(b)(2). See Dillingham Tug & Barge, 276 N.L.R.B. at 1271, 1985 WL 46305; New York Telephone, 211 N.L.R.B. at 116-18, 1974 WL 5130; Pacific Telephone, 193 N.L.R.B. at 83-84. The unions' actions in these cases fell within the literal language of section 8(a)(3)'s second proviso, the Board found, because the unions had invoked or threatened to invoke union-security agreements against employees whose membership had been "denied" or "terminated" for reasons other than failure to pay dues. On this point, while the employees in Dillingham Tug & Barge were technically "suspended" for 15 years, the Board found that this was the practical equivalent of expulsion or termination for purposes of sections 8(a)(3) and 8(b)(2). 278 N.L.R.B. at 85-86, 1986 WL 54066. Under this rationale, even though no section 8(a)(3) and 8(b)(2) violations were alleged in the fourth case, Telephone Traffic Union, 241 N.L.R.B. at 827, 1979 WL 8958, the union's one-year full suspension of the employee in that case would have supported a finding of a violation of those sections. Thus, each of these post-McGraw Edison cases involved action of a fundamentally different nature from that involved in the case before us. The action in those cases was sufficient to find a violation of sections 8(a)(3) and 8(b)(2), but, as we have already held, the discipline involved in this case clearly did not amount to the "denial" or "termination" of membership necessary to support such a finding. While this fact is not dispositive of the issue before us, it obviously supports our conclusion that the post-McGraw Edison cases cited above are entirely distinguishable from, and thus inapplicable to, the case at hand
 
 
 [5]
 Our conclusion is unaltered by the fact that two of these cases contained dicta suggesting that the holding of McGraw Edison might extend to cases where membership is "impaired," see Telephone Traffic Union, 241 N.L.R.B. at 826 n. 3, 1979 WL 8958; New York Telephone, 211 N.L.R.B. at 116-17, 1974 WL 5130, for dicta does not create a rule
 
 
 [6]
 Obviously, petitioner does not challenge the rule of McGraw Edison and its progeny, and we thus have no occasion to rule on it in this case
 
 
 [7]
 All of the McGraw Edison cases relied on by Gilbert were decided prior to Beck