307 F.3d 760
 UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL 1036, Petitioner,
Phillip Mulder; Charles Buck; Leon Gibbons; United Food and Commercial Workers Union, Local 7; United Food and Commercial Workers Union, Local 951, Intervenors,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Glenn Hilton; United Food and Commercial Workers Union, Local 951, Respondent-Intervenor.
Phillip Mulder; Glenn Hilton; Charles Buck; Leon Gibbons, Petitioners,
United Food and Commercial Workers Union, Local 7; United Food and Commercial Workers Union, Local 951, Intervenors,
v.
National Labor Relations Board, Respondent.
Rebecca McReynolds; Barbara Kipp, Petitioners,
United Food and Commercial Workers Union, Local 7; United Food and Commercial Workers Union, Local 951, Intervenors,
v.
National Labor Relations Board, Respondent.
National Labor Relations Board, Petitioner,
United Food and Commercial Workers Union, Local 7; United Food and Commercial Workers Union, Local 951, Intervenors,
v.
United Food and Commercial Workers Union, Local 1036, Respondent.
National Labor Relations Board, Petitioner,
United Food and Commercial Workers Union, Local 7; United Food and Commercial Workers Union, Local 951, Intervenors,
v.
United Food & Commercial Workers International Union, Local 7, Respondent.
 No. 99-71317.
 No. 99-71442.
 No. 99-71596.
 No. 00-70156.
 No. 00-70189.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 11, 2001.
 Filed March 25, 2002.
 Amended October 7, 2002.
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED David A. Rosenfeld, Van Bourg, Weinberg, Roger & Rosenfeld, Oakland, CA, for the petitioner-respondent, United Food and Commercial Workers Union, Local 1036.
 
 James B. Coppess, AFL-CIO, Washington, DC, for the intervenors, United Food and Commercial Workers Union, Locals 7 and 951.
 Steven Goldstein, for the respondent-petitioner, National Labor Relations Board.
 Glenn Taubman, National Right to Work Legal Defense Foundation, Inc., for the respondents-intervenors, Phillip Mulder, Charles Buck, Leon Gibbons, and Glenn Hilton.
 Richard J. Clair, National Right to Work Legal Defense Foundation, Inc., on the briefs for respondents-intervenors, Rebecca McReynolds and Barbara Kipp.
 On Petition for Review of Orders of the National Labor Relations Board.
 Before: SCHROEDER, Chief Judge, PREGERSON, REINHARDT, KOZINSKI, T.G. NELSON, TASHIMA, THOMAS, SILVERMAN, WARDLAW, W. FLETCHER and FISHER, Circuit Judges.
 
 ORDER
 
 1
 The Opinion filed March 25, 2002 is amended to include docket number 00-70189, which was inadvertently omitted from the opinion caption.
 
 
 2
 The mandate shall issue forthwith in docket number 00-70189.
 
 OPINION
 
 3
 REINHARDT, Circuit Judge.
 
 
 4
 The National Labor Relations Act ("NLRA" or "the Act"), as amended, establishes an elaborate and complicated structure that governs labor relations in almost all of the industries within the nation's private sector.[1] Collective bargaining is the central concern of that structure, and labor unions are essential to the collective bargaining process. The Act contains a union security provision, § 8(a)(3), that helps secure the role of unions in the collective bargaining process by permitting unions and employers to enter into agreements requiring employees to become union members.[2] It is the interpretation of that provision that is at issue in this case.
 
 
 5
 The union intervenors, United Food and Commercial Workers Union Locals 7 and 951, serve as the exclusive bargaining representatives for the employees of several retail food companies. Collective bargaining agreements ("CBAs") negotiated between the employers and the unions govern the terms and conditions of the employees' employment. The National Labor Relations Act, as amended, requires that an exclusive bargaining representative must represent all employees in a bargaining unit — union members and non-members alike — when bargaining for wages, benefits, and working conditions, and when resolving grievances with the employer.[3] 29 U.S.C. § 158(b)(2)-(3). The NLRA also permits the exclusive bargaining representative and the employer to require that all employees become dues-paying "members" of the union. NLRA § 8(a)(3). Thus all persons in the bargaining unit receive the benefits and share the economic costs of union representation. Were "free riders" able to obtain the full benefits of the union's efforts without paying their share of the costs, union membership would likely be drastically reduced and the collective bargaining system seriously undermined. Communications Workers of America v. Beck, 487 U.S. 735, 743, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988)
 
 
 6
 The Supreme Court held, in NLRB v. General Motors, 373 U.S. 734, 743, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963), that § 8(a)(3)'s "membership" requirement can be satisfied simply by the payment of the requisite dues.[4] Thus, employees under a "union shop" arrangement who are required by contract to become union members, may be subjected to only one membership requirement — the payment of dues — and employees under an "agency shop" arrangement who are required by contract only to pay dues need not become union members even in form. See Marquez v. Screen Actors Guild, 525 U.S. 33, 46, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998) (explaining that in light of General Motors and Beck, "the statutory language [of § 8(a)(3)] incorporates an employee's right not to `join' the union (except by paying fees and dues)"). Therefore, there is no realistic difference from a legal standpoint between a union shop and an agency shop, although under a union shop the union may, if it wishes, place an employee who only pays dues on its "membership" rolls. General Motors, 373 U.S. at 743-44, 83 S.Ct. 1453. There are, however, certain limitations on the costs that members in name only — or nonmembers[5] — can be compelled to bear by way of dues.[6] The Supreme Court held in Communications Workers of America v. Beck, 487 U.S. at 762-63, 108 S.Ct. 2641, that nonmembers need pay "only those fees and dues necessary to `performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues.'" (quoting Ellis v. Brotherhood of Railway, Airline and Steamship Clerks, 466 U.S. 435, 448, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984)). The Beck Court further characterized `necessary duties' as those functions that are "germane to collective bargaining, contract administration or grievance adjustment." 487 U.S. at 745, 108 S.Ct. 2641 (emphasis added). The issue to be decided in this case is whether or not Locals 7 and 951 violated the Beck rule by compelling nonmembers to pay their share of the costs of organizing their employers' competitors or, conversely, whether unions are permitted under the NLRA to charge nonmembers for the costs of such organizing activities. In short, is the function of organizing other employers in a competitive market germane to collective bargaining with the nonmembers' employer?
 
 
 7
 The individual petitioners in this matter are nonmembers of Locals 7 and 951, which serve as their exclusive bargaining representatives, and are employed by various employers in the retail food industry.[7] They filed charges with the National Labor Relations Board ("NLRB") contending that it was an unfair labor practice for the unions to use their dues to pay for the costs of organizing. The Board dismissed the charges, relying on its decision in California Saw and Knife Works, 320 NLRB 224, 1995 WL 791959 (1995), the first case in which it was called upon to apply Beck. In California Saw, the Board held that nonmembers' dues may be used for a union's activities outside the nonmembers' bargaining unit, but only if those activities are "germane to the union's role in collective-bargaining, contract administration and grievance adjustment."[8] In the present case, the Board determined, after extensive fact-finding, that "at least with respect to organizing within the same competitive market as the bargaining unit employer," organizing is germane to collective bargaining, and concluded that "[such] organizing expenses are chargeable to bargaining unit employees under the California Saw standard." United Food and Commercial Workers, 329 NLRB No. 69, 162 L.R.R.M. (BNA) 1177, 1999 WL 818607, at *6 (Sep. 30, 1999). The Board seeks enforcement of its order dismissing the petitioners' unfair labor practice charge, while the nonmembers seek review and ask us to vacate the order.
 
 
 8
 We have jurisdiction over the respective petitions under §§ 10(e) and 10(f) of the NLRA, 29 U.S.C. §§ 160(e)-(f). A panel of this court declined to enforce the Board's order, and granted the relief sought by the nonmembers, concluding that it was compelled to do so by Beck and Ellis.[9] United Food and Commercial Workers Union v. NLRB, 249 F.3d 1115 (9th Cir.2001). The court convened en banc to reconsider the matter.
 
 
 9
 We now enforce the order of the Board and hold that, under § 8(a)(3) of the NLRA, a union serving as a bargaining unit's exclusive bargaining representative is permitted to charge all employees, members and nonmembers alike, the costs involved in organizing, at least when organizing employers within the same competitive market as the bargaining unit employer.
 
 
 10
 I. Courts Are Required to Give Substantial Deference to the NLRB
 
 
 11
 The NLRB is one of the defining features of the NLRA's statutory scheme. Courts are required to defer to the NLRB on statutory interpretation under Chevron, and the deference to be accorded to the NLRB in its decisions on questions of fact and policy determinations is well settled. Moreover, under the NLRA, the Board has primary jurisdiction over claims of unfair labor practices, and the claim made by the petitioners — of improper assessment and use of union dues — constitutes an unfair labor practice claim under § 8(a)(3). Beck, 487 U.S. at 742, 743, 108 S.Ct. 2641 (discussing the primary jurisdiction of the Board over unfair labor practice claims); see also Lechmere, Inc. v. NLRB, 502 U.S. 527, 536, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992) ("It is certainly true, and we have long recognized, that the Board has the `special function of applying the general provisions of the Act to the complexities of industrial life.'").
 
 
 12
 The Chevron doctrine requires that this court defer to the NLRB's interpretation of the NLRA if its interpretation is rational and consistent with the statute. NLRB v. United Food and Commercial Workers Union, 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987) (citing Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Where the statute is ambiguous, Chevron dictates that "a court may not substitute its own construction of [the] statutory provision for a reasonable interpretation made by ... an agency." Chevron, 467 U.S. at 843-844, 104 S.Ct. 2778. Courts may only ignore the views of the agency where the intent of Congress is clear on the face of the statute. Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778. Here, the only statutory provision that governs the dues that nonmembers may be required to pay is § 8(a)(3). That section, however, does not describe what types of expenditures may or may not be made from those dues. Thus, for Chevron purposes, it is ambiguous.
 
 
 13
 The nonmembers assert that the Board is owed no special deference in the case before us in light of Seay v. McDonnell Douglas, 427 F.2d 996 (9th Cir.1970), further proceedings, 533 F.2d 1126 (9th Cir. 1976). In Seay, we stated:
 
 
 14
 [t]he policy behind the pre-emption doctrine is not served by deferring to the Board where a constitutional question is validly presented. The Board's special expertise in labor controversies does not extend to the interpretation of the Constitution. That field has traditionally been reserved to the courts.
 
 
 15
 427 F.2d at 1002-1003 (emphasis added). The Seay nonmembers asserted a substantial First Amendment claim: They contended that their dues "were used in substantial amounts for political and ideological purposes contrary to [their] wishes and in derogation of their constitutional rights under the First, Fifth and Ninth Amendments." 427 F.2d at 999. Seay was part of a line of cases resolving First Amendment claims made by nonmembers whose unions used their dues for political purposes, such as contributing to political candidates, engaging in political speech, and supporting or opposing legislation. The cases primarily arise in the public sector context or under the RLA. The guiding principle of the line of cases is that in order to protect the First Amendment rights of nonmembers, their dues may not be used for political purposes.[10] Seay applied this principle in the context of the NLRA. Because the issue in the case before us does not involve any claim (let alone a substantial claim) regarding First Amendment rights, but rather the question of whether organizing an employer's competitors is germane to collective bargaining, the statement in Seay on which the nonmembers rely in no way affects our obligation to defer to the Board.
 
 
 16
 The nonmembers also cite Dean v. Trans World Airlines, Inc., 924 F.2d 805, 809 (9th Cir.1991), in which we stated that the Supreme Court, in Chicago Teachers Union v. Hudson, 475 U.S. 292, 310, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), "establishe[d] `constitutional requirements for the Union's collection of agency fees.'" The nonmembers erroneously read our statement to mean that any charge that a nonmembers' dues are being used for activities that are not germane to collective bargaining requires interpretation of the Constitution. Neither Dean nor Hudson stands for any such proposition. Both cases involved the question of the procedures a union is required to establish in order to implement the guarantee that nonmembers' dues will not be used in a manner that violates their First Amendment rights. Although we stated in Dean that it was a constitutional violation for the union to collect dues without adhering to Hudson's procedural requirements, we did not proceed beyond that procedural ruling and suggest that it would be a violation of the Constitution for a union to use dues for non-political activities that are not germane to collective bargaining. Nor, of course, did Hudson.[11] 475 U.S. at 294, 106 S.Ct. 1066.
 
 
 17
 Where the claim made by nonmembers does not involve unions' use of dues for political purposes, but only raises the question whether the challenged union activities are germane to collective bargaining, we defer to the Board. The germane versus non-germane issue requires an informed assessment of the practical relationship between the challenged activity and the bargaining process. The Supreme Court has "not hesitated to defer to the Board's interpretation of the Act in the context of issues" that "implicate[] its expertise in labor relations." NLRB v. City Disposal Systems, Inc., 465 U.S. 822, 829-30 n. 7, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984). See Beth Israel Hospital v. NLRB, 437 U.S. 483, 500-501, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978) (stating that the Board is entitled to deference because it is "expert in federal national labor relations policy"). The issue before us requires the very expertise the Court emphasized in City Disposal Systems and Beth Israel Hospital. Accordingly, we do not hesitate to defer to the Board's determination here.
 
 
 18
 II. The Board's Decision that Organizing Is Germane to Collective Bargaining Is Correct and Is Entitled to Deference
 
 
 19
 Not only do the nonmembers fail substantially to contest the Board's actual factfinding in this case, but the Board's determinations are fully consistent with the realities of collective bargaining. Organizing is central to the purpose of the NLRA. It is a necessary first step to collective bargaining because without organizing, there can be no majority of union member employees who may lawfully insist that an employer bargain collectively. Because the union can only become the collective bargaining representative if enough employees agree, the initial recruitment and incorporation of new members into a nascent bargaining unit through organizing is crucial.
 
 
 20
 The specific question here involves organizing outside the nonmembers' bargaining unit, in particular the employees of competing employers. Such organizing may be crucial to improving the wages, benefits, and working conditions of employees in the bargaining unit. Organizing outside the bargaining unit, when successful, "eliminat[es] the competition of employers and employees based on labor conditions regarded as substandard." Apex Hosiery Co. v. Leader, 310 U.S. 469, 503, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). The fact that an employer's competitors are not unionized, and likely pay lower wages and provide lesser benefits, significantly weakens the union's ability to bargain with the employer, and decreases the union's prospects of achieving the economic objectives of the members of the bargaining unit.[12]
 
 
 21
 The NLRB's conclusion in this case that extra-bargaining unit organizing is germane to collective bargaining and a proper use of nonmembers' dues was supported by extensive economic research and data on organizing and collective bargaining in general, as well as with respect to the retail food industry. Expert testimony by several witnesses established that generally economists have found "a positive relationship between the extent of unionization of employees in an industry or locality and negotiated wage rates." 329 NLRB No. 69, 1999 WL 818607, at *7. Numerous studies by economists and labor scholars also documented a significant positive relationship between the rate of unionization and the negotiated wage rates in several union shop industries in the retail food area. Case studies of specific retail food geographic markets also confirmed the results of the statistical studies. 329 NLRB No. 69, 1999 WL 818607, at *7-*9. The NLRB's findings reveal that management is far more willing to negotiate higher wage rates when its competitors are subject to the same union costs. 329 NLRB No. 69, 1999 WL 818607, at *7. Conversely, management is comparatively unwilling to yield to union demands when its competitors are not subject to similar obligations and costs.
 
 
 22
 It is in recognition of these facts that the NLRB found that, for NLRA industries, organizing within the competitive market is germane to collective bargaining. Accordingly, the NLRB concluded that under the "necessary" or "germane" to collective bargaining standard of Beck, nonmembers may be compelled to bear their fair share of the costs of organizing. The Board's conclusions are not only reasonable and supported by substantial evidence, for which reasons alone we must adopt them, but they are completely in accord with the economic realities of collective bargaining, as well as with the language and purposes of the NLRA.[13]
 
 
 23
 III. Beck Does Not Bar the NLRB from Determining Which Expenses are Chargeable to Nonmembers, Including Expenses of Extra-Bargaining Unit Organizing
 
 
 24
 The nonmembers argue that the Board's decision was in error because the Supreme Court in Beck foreclosed the posibility that extra-bargaining unit organizing is germane to collective bargaining. This argument finds its origin in Ellis v. Brotherhood of Railway, Airline and Steamship Clerks, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984), in which the Supreme Court held that organizing was not germane to collective bargaining under the Railway Labor Act ("RLA"), and therefore its costs could not be charged to nonmembers. The RLA, in contrast to the NLRA, does not establish an administrative agency that is authorized to interpret and enforce the Act. In Ellis, therefore, unlike in cases under the NLRA, there was no administrative agency to which the courts could defer, and the judiciary was required to make its own determinations, ab initio, as to whether various activities were germane to collective bargaining.
 
 
 25
 The Ellis decision was made in the context of a statute designed to regulate the railroad industry. At the time the RLA was enacted, that industry was highly organized and the employers (and the organizing activities) were national in scope. The Court emphasized the fact that the president of a major railway labor union specifically represented to Congress at the time of the enactment of § 2, Eleventh of the RLA that the union shop would have no effect on the bargaining power of unions covered by the Act, and that it would serve only to make those unions stronger generally.[14] 466 U.S. at 451-52, 104 S.Ct. 1883. In addition, Ellis involved organizing that, in contrast to the case before us, was directed in part at employers that were not in the same branch of the transportation industry as the bargaining unit employer, and even at employers that were not in the transportation industry at all.[15] Ellis v. Brotherhood of Railway, Airline and Steamship Clerks, 685 F.2d 1065, 1075 (9th Cir.1982) (Whelan, J., dissenting) (quoting the lower court's findings of undisputed material facts as to the nature of the disputed expenses). In Ellis, the Court concluded that the only purpose organizing under the RLA could serve was to strengthen the union generally. Because this provided only attenuated benefits to nonmembers within a bargaining unit, the Court held that under the RLA organizing costs could not be charged to such individuals. 466 U.S. at 451, 104 S.Ct. 1883.
 
 
 26
 The nonmembers next point to the Court's statements in Beck that the RLA provision at issue in Ellis and the NLRA provision at issue in Beck are "statutory equivalents," which are "in all material respects identical," and that "Congress intended the same language to have the same meaning in both statutes." 487 U.S. at 745-46, 108 S.Ct. 2641. These statements were made in the context of the Court's holding that the provisions of the two Acts were designed to afford employees the same protection: that Congress intended to protect employees covered under both Acts against the unions' use of their dues for purposes not germane to collective bargaining. The nonmembers urge us to extend the Court's reasoning so as to hold that because organizing, which is conducted for the general purpose of strengthening the union, is not germane to collective bargaining under the RLA, the extra-bargaining unit organizing of competitor employers cannot be germane under the NLRA. 487 U.S. at 745-46, 108 S.Ct. 2641. Essentially, the nonmembers contend that the Supreme Court's statements in Beck regarding "statutory equivalen[ce]" require that the RLA provision and the NLRA provision be applied identically at the level of the specific expenditures that may be charged to nonmembers: They assert that expenditures not chargeable under one statute are necessarily not chargeable under the other, or to put it differently, that what is "germane" under one Act is identical in all cases and circumstances to what is "germane" under the other.[16]
 
 
 27
 We should first remove any question as to whether the Beck Court dealt with the question of what activities are germane to collective bargaining. It did not. In Beck, the union argued that unlike the RLA, the NLRA does not restrict unions to charging nonmembers only for those activities that are germane to collective bargaining, and that unions are free under the NLRA to expend nonmembers' dues on activities that do not serve to advance their interests as members of the bargaining unit. The Court rejected this argument, holding that Congress' intent in both statutes was the same — to permit only those expenditures that are germane to the collective bargaining function. 487 U.S. at 762-63, 108 S.Ct. 2641. It left to the Court of Appeals the ultimate resolution of the question of which specific expenditures were germane and therefore chargeable to nonmembers.
 
 
 28
 It is equally clear that the Court did not intend that "statutory equivalen[ce]" be applied at the level of specificity urged by the nonmembers, and that the NLRB remains free to determine what union activities are germane to collective bargaining in industries covered by the NLRA. There are two principal reasons why we conclude that the nonmembers' argument that "statutory equivalen[ce]" should apply to specific determinations of germaneness misperceives the force of the Beck statements. First, the nonmembers' reading of the term ignores the fact that Congress established entirely different procedures for the interpretation of each Act. Under the NLRA, primary jurisdiction over its interpretation lies with the NLRB, but under the RLA, exclusive jurisdiction lies, as with many statutes, with the courts. This difference was explicitly recognized by the Supreme Court in Beck, in which it asserted that "[u]nlike the NLRA, ... the RLA establishes no agency charged with administering its provisions, and instead leaves it to the courts to determine the validity of activities challenged under the Act." 487 U.S. at 743. This difference alone militates strongly against the automatic application of factual findings made by courts regarding the "germaneness" of various union activities in the nationwide transportation industry to cases involving run-of-the-mill local commercial businesses covered by the NLRA.
 
 
 29
 The practical effect of the nonmembers' argument would be to deprive the NLRB of its jurisdiction to make factual determinations regarding what is germane to collective bargaining in industries that have entirely different bargaining histories and procedures than the railroad industry. Adjudicating issues relating to the manner in which a union may properly operate is a major function of the NLRB, and the expertise of the Board in factfinding and the operation of labor policy is substantial. Moreover, the specific question presented in this case — whether "organizing" is "germane to collective bargaining" — is a complex and difficult one for the layman, member of the judiciary or not. The answer requires a sophisticated understanding of labor relations and the collective bargaining process. As the Seventh Circuit noted in International Association of Machinists & Aerospace Workers v. NLRB, 133 F.3d 1012 (7th Cir.1998), cert. denied, 525 U.S. 813, 119 S.Ct. 47, 142 L.Ed.2d 36 (1998),
 
 
 30
 [i]t is hard to think of a task more suitable for an administrative agency that specializes in labor relations, and less suitable for a court of general jurisdiction, than crafting the rules for translating the generalities of ... the statute as authoritatively construed in Beck ... into a workable system for determining and collecting agency fees.
 
 
 31
 133 F.3d at 1015.
 
 
 32
 The second reason we read the statutory equivalence statements as not requiring that all decisions regarding germaneness be identical under the two Acts is that the Supreme Court in Ellis explicitly based its decision upon its close review of the legislative history of the RLA. The Act was adopted in order to provide a labor relations structure for the railroad industry — an industry that was highly organized, and in which the process of collective bargaining was significantly different from that which exists under the NLRA.[17] The RLA establishes a highly detailed mandatory scheme for dispute resolution that has no parallel in the NLRA. In the case of a "minor" dispute[18] under the RLA, the union and employer are required to attempt to negotiate a settlement, and if unsuccessful, to submit to binding arbitration. RLA § 3, First. In the case of a "major" dispute, after negotiation and mandatory mediation are attempted, the parties must consider binding arbitration. §§ 6, 2, Second, 5, First, 7. Should either party refuse to arbitrate, the President may establish an Emergency Board where appropriate to investigate and report on the dispute. § 10. Only after completing these steps may a union or employer resort to self-help such as a strike or other unilateral action. §§ 2, Seventh, 5 First, 6, 10. See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Company, 394 U.S. 369, 378-379, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). The NLRA contains no similar scheme and no mandatory process of dispute resolution. In fact, the process by which collective bargaining is conducted, as well as the subject matter of that bargaining,[19] and the methods by which most contracts are ultimately obtained,[20] all differ substantially. In recognition of these and other differences, the Supreme Court has noted with respect to the collective bargaining process, "The relationship of labor and management in the railroad industry has developed on a pattern different from other industries. The fundamental premises and principles of the Railway Labor Act are not the same as those which form the basis of the National Labor Relations Act." Brotherhood of R.R. Trainmen v. Chicago R. & I.R. Co., 353 U.S. 30, 31 n. 2, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). It is implausible, given these significant differences between the processes by which labor unions and employers negotiate agreements and resolve disputes under the two Acts, that in Beck, the Court intended, without so stating, that only what is "germane" to the bargaining process under the RLA can be considered "germane" to the entirely dissimilar bargaining process under the NLRA.
 
 
 33
 We recognize that in Beck the unions argued that differences between the two statutes and in their legislative histories required that the two provisions at issue here be given entirely different meanings. The Court rejected the argument, holding that the provisions were to be given the same meaning: under both Acts, the Court said, only the costs of activities germane to collective bargaining may be charged to nonmembers. Giving the provisions this same general meaning, however, does not mean that they must be applied identically under two entirely different sets of factual and legal circumstances. The Court has stated that there are significant limitations on the analogies that can be drawn between the two statutes. For example, in Jacksonville Terminal Co., the Court refused to read the secondary boycott prohibitions of the NLRA into the RLA, because although the NLRA is helpful in "mapping out very general boundaries of self-help under the [RLA]," the complexities of the question presented and the fact that "[f]rom the point of view of industrial relations our railroads are largely a thing apart" made it inappropriate to try to incorporate into the RLA the "detailed law" on the subject developed under the NLRA. 394 U.S. at 391-92, 89 S.Ct. 1109 (citations omitted). The boundaries for the proper application of the Beck statements stem from similar reasons and have a similar effect: The Beck statements do not require that courts import the "detailed law" developed under the RLA into the NLRA.
 
 
 34
 The Supreme Court has repeatedly admonished the lower courts against overreading its precedents, and we find that admonishment particularly applicable here. See Alexander v. Sandoval, 532 U.S. 275, 121 S.Ct. 1511, 1517, 149 L.Ed.2d 517 (2001) ("[T]his Court is bound by holdings, not language."). Perhaps recognizing the differences in organizing under the two statutes and the required deference to the NLRB, the Beck Court offered no indication of what types of expenditures might be `germane to collective bargaining,' or `necessary to performing the duties of the exclusive bargaining representative,' under the NLRA when it held that `germaneness' was the applicable standard under both statutes. We see no reason to extend, and thereby transform, the holding of Beck into a decision the Court did not make.
 
 
 35
 In the case before us, the Board undertook thorough fact-finding and a searching examination of the statute and the governing case law when applying the Beck germaneness rule to the case of organizing. Its findings regarding NLRA-covered industries revealed factual and economic circumstances that are wholly different from those prevailing in the railroad industry when the RLA provision was enacted, and at the present time, including fundamental differences in the nature of the bargaining process itself. Based on all these circumstances, the Board reached the conclusion that organizing under the NLRA, at least with respect to competitors of the employers' employees, is germane to collective bargaining. The result reached by the Board is not precluded by the language of Beck, but is fully consistent with it. Accordingly, it is our duty under the NLRA, to affirm the Board's decision and enforce its order.[21]
 
 IV. Conclusion
 
 36
 We agree with the Board that the decision of the Supreme Court in Beck is not to be read as holding that only expenses that are germane under the RLA are germane under the NLRA, and we conclude that we are required to defer to the Board's ruling in this proceeding — a ruling that is consistent with the language and purpose of the NLRA, as well as with the economic realities of the collective bargaining process. Accordingly, we hold that under § 8(a)(3) of the NLRA, a union serving as a bargaining unit's exclusive bargaining representative is permitted to charge nonmembers the costs involved in organizing, at least when organizing employers within the same competitive market as the bargaining unit employer.
 
 
 37
 Enforcement of the Board's orders with respect to Locals 7 and 951 is GRANTED. The petitions for review of those orders are DENIED. Enforcement of the Board's order with respect to Local 1036 is DENIED. The petition for review of that order is GRANTED. The matter involving Local 1036 is REMANDED to the Board for action in accordance with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The National Labor Relations Act was enacted in 1935 and significantly amended in 1947, in a series of amendments collectively entitled the Labor Management Relations Act of 1947. 29 U.S.C. §§ 151 et seq. The railroad industry is covered separately by the Railway Labor Act ("RLA") enacted in 1926. 46 U.S.C. §§ 151-188. The RLA was amended in 1936 to cover airlines
 
 
 [2]
 Section 8(a)(3) permits an employer and a union to enter into an agreement which "require[s] as a condition of employment membership [in the union] on or after the thirtieth day following the beginning of such employment."
 
 
 [3]
 Under the NLRA, union representation is conducted on a bargaining unit basis; a bargaining unit is "a grouping of two or more employees aggregated for the assertion of organizational rights or for collective bargaining." 1 Patrick Hardin,The Developing Labor Law 448 (1992). If the employees in a given workplace make a sufficient showing of interest, the NLRB will determine the boundaries of the appropriate bargaining unit and conduct an election amongst the employees in the unit to determine whether the union shall serve as the unit's exclusive bargaining representative (or, if more than one union wishes to do so, which union). Although the statute does not specify how the composition of an appropriate bargaining unit shall be determined — the bargaining unit is simply referred to as "a unit appropriate for such purposes [i.e., collective bargaining]" — the NLRB has developed a body of case law on the subject. 29 U.S.C. § 159(a). The NLRB examines a number of factors, all revolving around whether the employees in the proposed bargaining unit share a "community of interests." Katherine V.W. Stone, The New Psychological Contract: Implications of the Changing Workplace For Labor And Employment Law, 48 UCLA L.Rev. 519, 621-24 (2001). Those factors include "(1) extent and type of union organization of employees; (2) bargaining history of the industry, as well as with respect to the parties before the Board; (3) similarity of duties, skills, interests and working conditions of the employees; (4) organizational structure of the company; and (5) the desires of the employees." 1 Hardin, supra, at 449. Because of the multiplicity of factors, a number of bargaining units may exist at a single employer's plant or store, or one bargaining unit may exist across various employers. See 1 Hardin, supra, at 462-72, 508-21 (discussing various types of unit classifications and multi-employer units). We should also note that an NLRB election is not a prerequisite to an employer's recognition of a union or its agreement to a CBA. All that is required is that the majority of the employees in the unit desire to be represented by the union and that the unit for bargaining be "appropriate."
 
 
 [4]
 Section 8(a)(3) describes the required dues as "the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."
 
 
 [5]
 The terms "dues-paying nonmembers," "financial core members," "objecting nonmembers," and "nonmembers," are used interchangeably in the case law to refer to employees who pay only the required dues or the "agency fees," regardless of whether the employees are subject to a union shop or an agency shop provision. In this case, while we use the term "nonmembers," throughout our opinion, our analysis and decision are equally applicable to employees in both agency shops and union shops. We note that the nonmembers in this case "resigned" from the union, asserting their rights underBeck and General Motors. United Food and Commercial Workers, 329 NLRB No. 69, 162 L.R.R.M. (BNA) 1177, 1999 WL 818607, at *1-*2 (Sep. 30, 1999). Because they were employed under a union shop arrangement, Local 7 chose to treat its former members as "financial core members." Id. Local 951 accepted the resignations of its members and treated them as nonmembers. Id. The Board, in its decision, refers to both groups of employees as "nonmembers," and for that reason, we do also.
 
 
 [6]
 The term "dues", as used throughout our opinion, includes all payments required of the nonmembers, including "fees" and "assessments."
 
 
 [7]
 Mulder, Buck and Gibbons were employees of Meijer, Inc. in Michigan, for which Local 951 serves as the exclusive bargaining representative. McReynolds was an employee of City Markets in Glenwood Springs, Colorado, for which Local 7 serves as the exclusive bargaining representative. Kipp was an employee of City Markets in Fruita, Colorado, for which Local 7 serves as the exclusive bargaining representative. 329 NLRB No. 69, 1999 WL 818607, at *1-*2
 
 
 [8]
 The NLRB's decision was upheld by the Seventh Circuit which enforced the Board's orderInternational Association of Machinists & Aerospace Workers v. NLRB, 133 F.3d 1012 (7th Cir.1998), cert. denied, 525 U.S. 813, 119 S.Ct. 47, 142 L.Ed.2d 36 (1998).
 
 
 [9]
 Ellis v. Brotherhood of Railway, Airline and Steamship Clerks, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984).
 
 
 [10]
 See Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (holding that, in the public employment context, unions are not permitted to spend nonmembers' dues on political activities); Brotherhood of Railway Clerks v. Allen, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963) (holding that, under the RLA, unions are not permitted to spend nonmembers' dues on political activities); International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (same).
 
 
 [11]
 Because the Supreme Court inHudson sought to protect the constitutional rights of nonmembers not to have their dues used for political purposes, it established "constitutional" procedural requirements governing the collection of dues. Hudson requires "an adequate explanation of the basis for the [dues], a reasonably prompt opportunity to challenge the amount of the [dues] before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." 475 U.S. at 310, 106 S.Ct. 1066. From a practical standpoint, a single set of procedures is necessary for the implementation of the guarantee that nonmembers will have a right to challenge the unions' uses of their dues. Accordingly, the Hudson procedures are applicable to the collection of dues generally, and no distinction is made between expenditures that violate First Amendment rights and expenditures that are simply non-germane.
 
 
 [12]
 Members of Congress enacting § 8(a)(3) in 1947 vigorously (and successfully) opposed a proposal prohibiting a union from serving as the exclusive bargaining representative for competing employers precisely because union organizing of competing employers "protects wage standards from being undercut by lower-wage areas and lower-wage employers." 2 NLRB,Legislative History of the Labor Management Relations Act, 1947, at 1039 (Sen.Murray). Similarly, they argued, "employees must make their combination extend beyond one shop" because otherwise "organized workers would ... be required to conform to the standard of the lowest paid, unorganized workers." 1 Id. at 680 (Rep.Price).
 
 
 [13]
 We leave it to the Board to determine, in subsequent cases applying the rule we today approve, whether or not challenged organizing expenses indeed relate to "organizing within the same competitive market."
 
 
 [14]
 The RLA union-security clause, § 2, Eleventh, 45 U.S.C. § 152, enacted in 1951, was explicitly modeled on § 8(a)(3) of the NLRA, and the language of the two provisions is virtually identical. Section 2, Eleventh states that employers and unions may enter into agreements "requiring, as a condition of continued employment, that within sixty days following the beginning of such employment,... all employees shall become members of the labor [union]." The provision describes the required dues as "the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership."
 
 
 [15]
 The Court did not comment on the fact that the employer inEllis was an airline rather than a railroad. We, too, consider that fact to be of no significance. The Court was construing an Act that was designed to govern the railroad industry and that was only amended later to cover the airline industry as well. See note 1, supra.
 
 
 [16]
 The nonmembers assert that this court held inSeay v. McDonnell Douglas Corp., 427 F.2d 996 (9th Cir.1970), further proceedings, 533 F.2d 1126 (9th Cir.1976), that RLA cases interpreting the equivalent union-security provision are "equally applicable" to the NLRA. They grossly mischaracterize our statement in Seay. In Seay, we stated that two specific cases, International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), and Brotherhood of Railway Clerks v. Allen, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), RLA cases dealing with the constitutional question of whether nonmembers' dues could be used for political purposes, were equally applicable to the NLRA. Seay, 427 F.2d at 1003; Seay, 533 F.2d at 1128 n. 3. The nonmembers in this case make no similar constitutional claim, and do not contend that the holdings in Street and Allen are controlling.
 
 
 [17]
 The industries covered by the RLA, at the time of enactment of the RLA union-security provision, had over 90% membershipInternational Machinists v. Street, 367 U.S. at 754, 762, 81 S.Ct. 1784 (citing Congressional testimony). In contrast, the industries covered by the NLRA historically had very low levels of organization. Unionization levels in the private sector peaked at 38% in 1954, after about 20 years of growth following the passage of the NLRA. By 1993, union density had fallen to 13%, and is now less than 10%. Christopher David Ruiz Cameron, The Labyrinth of Solidarity: Why the Future of the American Labor Movement Depends on Latino Workers, 53 U. Miami L.Rev. 1089, 1103 (1999). See also Jennifer Friesen, The Costs of "Fee Speech" — Restrictions on the Use of Union Dues to Fund New Organizing, 15 Hastings Const. L.Q. 603, 642 (discussing the "dramatic decline in union strength since the end of World War II").
 
 
 [18]
 "Minor" disputes "are controversies over the meaning of an existing collective bargaining agreement in a particular fact situation, generally involving only one employee."Brotherhood of R.R. Trainmen v. Chicago R. & I.R. Co., 353 U.S. 30, 32, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); RLA § 2, Sixth. "Major" disputes "result when there is disagreement in the bargaining process for a new contract." 353 U.S. at 32, 77 S.Ct. 635; RLA § 2, Seventh.
 
 
 [19]
 Although under both Acts, there is a duty to bargain in good faith over certain subjects, and parties are permitted to bargain to an impasse over them, the Court has stated explicitly that the mandatory scope of bargaining under each Act is not the same, despite similar language describing the duty to bargainFirst Nat. Maintenance Corp. v. N.L.R.B., 452 U.S. 666, 686 n. 23, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981).
 
 
 [20]
 In the transportation industry, the vast majority of disputes are settled by direct negotiation, and resort to strikes is relatively rare. The number of strikes in NLRA-covered industries far outstrips the number of strikes in the transportation industry; where there were thousands of NLRA strikes per year, one study showed that roughly a dozen occurred annually in the transportation industry. Beatrice M. Burgoon,Mediation of Railroad and Airline Bargaining Disputes, The Railway Labor Act at Fifty: Collective Bargaining in the Railroad and Airline Industries 71, 73-74, 93-94 (1977).
 
 
 [21]
 In addition to the unfair labor practice charges brought against Locals 7 and 951 by several nonmembers, petitioner Hilton brought a charge against United Food and Commercial Workers Union Local 1036 claiming that the "welcoming letter" issued by the local was inadequate to advise new employees of their rights underNLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). The NLRB found that the letter indeed was inadequate and ordered that the union take certain affirmative steps to remedy the violation. 329 NLRB No. 69, 1999 WL 818607, at *16-*19. We conclude that the original panel opinion issued in appeal No. 99-71317 was correct as to the "welcoming letter," and we reinstate the part of the opinion upholding the Board's decision that the letter was inadequate to advise new employees of their General Motors rights, but remanding for the Board to modify its remedy as it was overbroad. United Food and Commercial Workers Union v. NLRB, 249 F.3d at 1120.