# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIONAL LABOR RELATIONS
BOARD,
                              *Petitioner,*

            and

HYO CHOL LIM,
                              *Intervenor,*

            v.

STUDIO TRANSPORTATION DRIVERS
LOCAL 399; INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND
HELPERS OF AMERICA,
                              *Respondent.*

No. 06-72695

NLRB No.
31-CB-11179

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted
February 4, 2008—Pasadena, California

Filed May 12, 2008

Before: Harry Pregerson and Kim McLane Wardlaw, Circuit
Judges, and Ronald B. Leighton,* District Judge.

Opinion by Judge Pregerson

---

*The Honorable Ronald B. Leighton, United States District Judge for
the Western District of Washington, sitting by designation.

## COUNSEL

Kellie Isbell, National Labor Relations Board, Washington, D.C., for the petitioner.

John C. Scully, National Right to Work Legal Defense Foundation, Inc., Springfield, Virginia, for the intervenor.

Robert A. Cantore, Gilbert & Sackman, Los Angeles, California, for the respondent.

## OPINION

PREGERSON, Circuit Judge:

The National Labor Relations Board ("the Board") asks this court to enforce its order finding that Studio Transportation Drivers, Local 399 ("the Union") committed an unfair labor practice against Hyo Chol Lim, who refused to join the

Union. We have jurisdiction under 29 U.S.C. § 160(e). We grant the Board's application to enforce the order.

## I. Background

Hyo Chol Lim ("Lim") was an employee of Hilltop Services, a subsidiary of Universal Studios. The Union represented a bargaining unit of about ten air conditioning, electrical, and general maintenance technicians who work for Hilltop. Local 399 also represented about 2,500 drivers and wranglers employed by major motion picture studios. Under a collective bargaining agreement ("CBA") between the Union and the studios, the studios were required to hire drivers and wranglers according to specific rules. The CBA's rules were violated whenever a studio hired a driver or wrangler who was not on the Union roster. A studio could also violate the CBA by hiring a driver or wrangler from a lower seniority tier if an employee listed on a higher seniority tier was available. Within each seniority tier, however, a studio was free to hire whichever employee it wished. When a studio violated the CBA in hiring drivers or wranglers, the Union would file a grievance, and an arbitrator would require the studio to pay "liquidated damages" to the Union.[1] These damages were awarded to the Union itself, as opposed to individual employees, because of the difficulty in determining which employee from the Union roster would have been hired had the studio followed the proper hiring procedure.

---

[1]The parties use the term "liquidated damages" to refer to payments made to the union as a whole rather than to the individually aggrieved employees. This, of course, differs from the term's standard understanding in contract law, where it refers to a damages amount set forth in a contract to be paid in the event of a breach. *Black's Law Dictionary* 949-50 (8th ed. 2004). All of the "liquidated damages" awards at issue here were for violations in hiring drivers and wranglers, not for any hiring violations related to Lim's bargaining unit of Hilltop air conditioning, electrical, and general maintenance technicians.

Local 399's collective bargaining agreement includes a union security clause. Union security clauses require all employees to become members of the Union within a certain period of time after being hired. In April 2002, Lim notified the Union that he was asserting his rights as a *Beck* objector, based on the right granted him under the Supreme Court's decision in *Communications Workers of America v. Beck,* 487 U.S. 735 (1988). Under that decision, employees who work under collective bargaining agreements with union security clauses can refuse to join the union as long as they agree to pay their fair share of representational expenses. *Id.* at 762-63. Lim was the only *Beck* objector in Local 399 at that time. The Union conceded Lim's right to refuse to join the Union under *Beck*, but informed him that his fair share of representational expenses would be 99.6% of dues owed by Union members.

Lim, represented by the National Right to Work Legal Defense Foundation, filed a charge with the Board challenging this 99.6% figure and alleging that the Union's method of calculating dues was an unfair labor practice under § 8(b)(1)(a) of the National Labor Relations Act (the "Act"). Specifically, Lim challenged the Union's decision to use "liquidated damages" obtained in the sum of $26,705 to fund non-representational expenses like political and charitable donations. Lim argued that this practice unfairly increased his fair share fee by reducing the amount of money the Union spent on non-representational expenses from its general fund, and thus increased the percentage of representational expenses that he owed.

The Acting Regional Director of the Los Angeles office of the Board filed a complaint against the Union. The Board contended that the Union's liquidated damages income should have been excluded from the calculation of the fair share fee owed by Lim. The Board noted that if the "liquidated damages" income were excluded, Lim would have only paid as a fee 98.8% of full union member dues, not 99.6%.

The parties agree on the basic framework for how Lim's representational fees should have been calculated. They agree that the fair share fee for *Beck* objectors like Lim should be calculated as a percentage of the regular dues owed by Union members. They also agree that the percentage used to calculate the fair share fee of *Beck* objectors is the percentage of the Union's expenses that qualify as "representational."[2] Finally, the parties agree on how much the Union spent on representational expenses ($3,193,034) in the year 2001, the year being used in the calculation of Lim's representational fees. The parties disagree, however, on the appropriate total amount for non-representational expenses. The Union argues that the $26,705 "liquidated damages" award may be applied to reduce its non-representational expenses in calculating the fair share fee chargeable to Lim. The Board, on the other hand, disagrees, and contends that the Union may not use the "liquidated damages" award to reduce non-representational expenses in the calculation. The difference between the two calculations is summarized in the following table:

|  | Union's Representational Expenses | Union's Non-Representational Expenses | Union's Total Expenses | % of Member Dues Chargeable to Lim[3] |
| --- | --- | --- | --- | --- |
| Board's Calculation | $3,193,054 | $38,484 | $3,231,538 | 98.8% |
| Union's Calculation | $3,193,054 | $11,779 | $3,204,833 | 99.6% |

The case was heard before an Administrative Law Judge

---

[2]Because none of the parties challenge this approach, we do not consider whether it satisfies the Supreme Court's requirement that *Beck* objectors only pay their fair share of representational expenses. *See Beck*, 487 U.S. at 762-63.

[3]This percentage is calculated by dividing the union's representational expenses by the union's total expenses.

("ALJ") on November 3, 2003. The ALJ found that the Union violated the Act, ordered the Union to recalculate the fair share fee required of *Beck* objectors like Lim, and to reimburse Lim according to the Board's calculation. A three-member panel of the Labor Board unanimously agreed with the ALJ's finding that the Union's practices violated the Act. The Board applied to this court to enforce its order, which we now consider.

## II.   Standard of Review

"The Board's order will be upheld on appeal if it correctly applied the law and its factual findings are supported by substantial evidence." *Glendale Associates, Ltd. v. NLRB*, 347 F.3d 1145, 1151 (9th Cir. 2003). This court defers "to the NLRB's interpretation of the NLRA if its interpretation is rational and consistent with the statute." *United Food and Commercial Workers Union, Local 1036 v. NLRB*, 307 F.3d 760, 766 (9th Cir. 2002) (citation omitted).

## III.   Discussion

Section 8(a)(3) of the National Labor Relations Act allows unions and employers to agree to union security clauses. Specifically, that section provides that "nothing in this subchapter . . . shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership" in the union. 29 U.S.C. § 158(a)(3). It goes on to state that "no employer shall justify any discrimination against an employee for nonmembership in a labor organization . . . if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership." *Id.*

**[1]** In *Communications Workers of America v. Beck*, the Supreme Court held that "§ 8(a)(3) permits an employer and

a union to enter into an agreement requiring all employees to become union members as a condition of continued employment, but the 'membership' that may be so required has been 'whittled down to its financial core.' " 487 U.S. 735, 745 (1988) (quoting *NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 742 (1963)). *Beck* held that § 8(a)(3) "authorizes the exaction of only those fees and dues necessary to 'performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues.' " *Id.* at 762-63 (quoting *Ellis v. Railway Clerks*, 466 U.S. 435, 448 (1984)). The fees and dues exacted for performing representational duties are sometimes called "fair share" fees, because they represent fair and reasonable cost of providing representational services to each employee represented by the union, whether such employee is a *Beck* objector or full-fledged union member. *Beck* objectors are thus not required to pay for expenses that are not germane to representation, such as political or charitable donations.

**[2]** Here, the Board held that the union violated the Act by offsetting its "liquidated damages" from its nonrepresentational expenses. The Board relied on its previous decision in *Teamsters Local 618 (Chevron Chemical Co.)*, in which it held that a union could not offset from nonrepresentational expenses the interest and dividend income it had received, because "there [was] no evidence in the record . . . that the interest and dividend income was generated solely from funds (or assets purchased from funds) other than dues and fees for representational services exacted equally from all unit employees, including objectors . . . ." 326 NLRB 301, 302 (1998). Similarly, the "liquidated damages" in this case were derived from arbitration that had been funded partially by *Beck* objectors like Lim. Therefore, the Board held that the union could not offset these "liquidated damages" from its nonrepresentational expenses.

**[3]** The Board's interpretation is rational and consistent with the Act. Whenever a union's representational expenses

generate secondary income—be it interest and dividend income in *Chevron Chemical Co.* or "liquidated damages" in this case—the union could use those funds for representational expenses, which would in turn lower the dues required of full union members and *Beck* objectors alike. Therefore, in choosing to spend the secondary income on political and charitable contributions rather than on representational expenses, the union is essentially increasing the dues required of *Beck* objectors in order to pay for these contributions. That is exactly what the Supreme Court prohibited in *Beck*. 487 U.S. at 762-63.

## IV. Conclusion

[4] We hold that the Board's interpretation of the National Labor Relations Act is rational and consistent with the Act, and we therefore **GRANT** the Board's application to enforce its order.

**GRANTED.**